827 F.Supp. 1014 (1993)
In re JOINT EASTERN AND SOUTHERN DISTRICT ASBESTOS LITIGATION.
Mrs. Arlene M. MAIORANA, Individually and as Administratrix of the Estate of John Maiorana, Plaintiff,
v.
NATIONAL GYPSUM COMPANY; AC & S, Inc., Armstrong World Industries, Inc., f/k/a Armstrong Cork Company; The Celotex Company, individually and as successor-in-interest to Philip Carey Corporation, Briggs Manufacturing Co., Smith and Kanzler Corporation and Panacon Corporation; Eagle Picher Industries, Inc.; GAF Corporation; Nicolet Inc., individually and successor-in-interest to Keasbey-Mattison Company; Raymark Industries, Inc.; individually and as successor-in-interest to Raybestos-Manhattan, Inc.; Owens-Corning Fiberglas Corp.; U.S. Mineral Products Company; H.K. Porter Company, Inc., individually and successor to Southern Textile Corporation and Southern Asbestos Company; The Flintkote Company; Carey Canada, Inc.; Fibreboard Corporation; Rock Wool Manufacturing Co., Inc.; Owens-Illinois, Inc.; Turner & Newall, PLC., individually and as successor to Keasbey-Mattison Corporation; United States Gypsum Company; Dana Corporation, individually and as successor to Smith & Kanzler Company and Victor Gasket Company; Certainteed Corporation; TAF International Ltd., formerly Turner Asbestos Fibers, Ltd.; Pittsburgh Corning Corporation, individually and as successor to Unarco Industries, Defendants.
OWENS-CORNING FIBERGLAS CORPORATION, Third-Party Plaintiff,
v.
MANVILLE CORPORATION ASBESTOS DISEASE COMPENSATION FUND; Keene Corporation, individually and as successor-in-interest to the Baldwin-Ehret-Hill Company, Keene Building Products Company and Ehret Magnesia *1015 Manufacturing Company; H & A Construction Company, individually and as successor to Spraycraft Corporation; Garlock, Inc.; Empire-Ace Insulation Manufacturing Corporation, individually and as successor to Empire Asbestos Company; Combustion Engineering, Inc., W.R. Grace and Company; Babcock & Wilcox Company; Bell/Atlas Asbestos Corp.; Port Authority of New York and New Jersey; Nassau County Medical Center, a/d/a Meadowbrook Hospital; DNS Metal Industries, Inc., individually and as successor-in-interest to Alpine Sheetmetal; and Triangle Sheet Metal, Third-Party Defendants (Two Cases).
UNITED STATES MINERAL PRODUCTS COMPANY, Second Third-Party Plaintiff,
v.
TRIANGLE SHEET METAL WORKS, INC.; New York Telephone Company; DNS Metal Industries, Inc.; individually and as successor to Alpine Sheetmetal & Ventilating Company, Inc.; Sheet Metal Workers International Union, Local 28; Tishman Realty & Construction Co., Inc.; Castagna & Son, Inc., HRH Construction Co., Mario & DiBono Plastering Co., Inc.; Port Authority of New York and New Jersey; Nassau County Medical Center, f/k/a Meadowbrook Hospital, Second Third-Party Defendants.
No. 88 Civ. 3317 (RWS).
United States District Court, S.D. New York.
July 23, 1993.
*1016 *1017 *1018 *1019 *1020 *1021 *1022 Levy Phillips & Konigsberg by Moshe Maimon, of counsel, New York City, for plaintiff.
Barry McTiernan & Moore by Suzanne M. Halbardier, of counsel, New York City, for defendant Mario & DiBono Plastering Co., Inc.
Congdon, Flaherty, O'Callaghan, Reid, Donlon & Travis by Tod Travis, of counsel, Garden City, for defendant Castagna & Son, Inc.
D'Amato & Lynch by John J. Cullen, of counsel, New York City, for Port Authority of NY and NJ.
*1023 Danaher, Tedford, Lagnese & Neal, P.C. by Kenneth R. Neal, Paul F. Slater, of counsel, New York City, for defendant U.S. Mineral Products Co.
McMahon, Martine & Merritt by William D. Gallagher, of counsel, New York City, for defendant Tishman Realty & Const. Co.

OPINION
SWEET, District Judge.
Following a jury verdict rendered on February 10, 1993, in favor of the plaintiff Arlene Maiorana (the "Plaintiff"), certain defendants and third-party defendants (collectively, the "Defendants") in this action have filed post-trial motions. The Plaintiff alleged and the jury found that the asbestos-containing products of certain of the Defendants were the proximate cause of the death of her husband, John Maiorana ("Maiorana").
After the verdict, Defendant and second third-party plaintiff United States Mineral Product Company ("USMP"), the sole remaining direct Defendant left in the trial, moved on March 10, 1993, pursuant to Rule 50(b), Fed.R.Civ.P., for judgment notwithstanding the verdict or, more properly, for judgment as a matter of law.[1] USMP also moved for a new trial or, in the alternative, for remittitur pursuant to Rule 59, Fed. R.Civ.P., on the grounds that damages are excessive and that the Court failed to instruct the jury adequately pursuant to New York Labor Law § 200. Third-party Defendants Mario & DiBono Plastering Co. ("Mario & DiBono"), Castagna & Son, Inc. ("Castagna"), and Tishman Realty & Construction Co. of New York, Inc. ("Tishman"), have sought similar relief. Castagna moved for a stay of execution of judgment as well. Both Castagna and Tishman also have moved for judgment on their cross-claims for common law indemnity against Mario & DiBono, the Defendant who impleaded them.[2] Finally, third-party Defendant the Port Authority of New York and New Jersey (the "Port Authority"), which was found not liable by the jury, has opposed the motion of USMP for a new trial pursuant to § 200, N.Y.Lab.L.
For the following reasons, the motions for judgment as a matter of law are granted. In the event that this decision is appealed and overturned upon appeal, all motions filed by the parties are granted in part and denied in part.

The Parties
The Plaintiff is a natural person and is the widow of John Maiorana. She resides and is domiciled in the State of New York.
Defendant and second third-party Plaintiff USMP is a corporation duly organized and existing under the laws of the State of New Jersey.
Third-party Defendants Mario & DiBono, Castagna, and Tishman are corporations duly organized and existing under the laws of the State of New York.
Third-party Defendant the Port Authority is a governmental entity duly organized and existing under and by virtue of the laws of the States of New York and New Jersey, with its principal place of business in New York. The Port Authority built and owns the World Trade Center (the "WTC") in New York, New York.

Prior Proceedings
The Plaintiff filed her original complaint in this diversity action on July 28, 1987, as part of a case brought by sixteen plaintiffs on behalf of themselves and their deceased spouses, see In re Joint E. & S. Dist. Asbestos Litig., 758 F.Supp. 199 (S.D.N.Y.1991) ("Asbestos Litig. I"), rev'd, 964 F.2d 92 (2d Cir.1992) ("Asbestos Litig. II"). Defendant and second third-party plaintiff USMP filed its second third-party complaint on December 14, 1990.
*1024 Certain Defendants, including USMP, moved for summary judgment alleging that the only evidence which the Plaintiff had set forth to prove that her husband's colon cancer was caused by his exposure to asbestos was epidemiological evidence, and because this evidence did not indicate that asbestos exposure created at least a two-fold increase in the risks of getting colon cancer and thus the Defendants' actions could not have been "more likely than not" the cause of his cancer, it was insufficient as a matter of law. The motion for summary judgment was granted on February 26, 1991.
The Plaintiff appealed, and the Court of Appeals reversed the grant of summary judgment status on the grounds that the Plaintiff had presented clinical evidence of causation in addition to the epidemiological studies: "Maiorana's own medical records and personal history were the clinical evidence upon which plaintiff's expert witnesses based their opinions that asbestos exposure was a significant factor in causing his colon cancer." Asbestos Litig. II, 964 F.2d at 96. The Court found that the plaintiff's experts could testify that Maiorana's exposure to asbestos was a "significant factor" and "a proximate cause, and a substantial factor" in the development of his colon cancer because:
[t]hey based their conclusions on their review of Mr. Maiorana's medical records, occupational and medical history, their knowledge as experts either in occupational medicine or epidemiology and their review of epidemiological studies. They also appropriately based their conclusions on the lack of other factors that could have caused Mr. Maiorana's colon cancer..... Granting plaintiff all favorable inferences, these statements are the equivalent of stating that asbestos exposure more probably than not caused the colon cancer. Medical experts need not invoke technical legal phrases in order to convey their medical opinions.
Id. at 96-97.
The case was tried to a jury from January 20 to February 10, 1993. The jury was charged on strict liability and negligence of manufacturers and on the negligence of all third party defendants. The jury, after allocating percentages of fault among the defendants and certain non-parties via special verdict, returned a verdict in favor of the plaintiff in the total amount of $4,510,000. The jury found USMP 50% responsible for the Plaintiffs' damages and three of the third-parties approximately equally negligent (both contractors were assessed to be 14% responsible; subcontractor Mario & DiBono was assessed to be 15% responsible). The jury absolved the Port Authority of any liability.
Oral argument was heard on the post-trial motions of USMP and the third-party Defendants on March 10, 1993, and these motions were considered fully submitted at that time.

The Facts
USMP was the manufacturer of Cafco D, an asbestos-containing fireproof spray material used in the construction of both the WTC in Manhattan and Meadowbrook Hospital in Nassau County, New York. The Port Authority was the owner of the WTC. Tishman was the Port Authority's prime or general contractor at the WTC job site and the Port Authority's designated agent for dealing with the subcontractors and trade workers. Castagna was the general contractor for Meadowbrook Hospital.
Proof offered at trial established that both Castagna and Tishman had inspectors and workers on the site with direct control and authority over the various subcontractors and employees. Both Castagna and Tishman entered into contracts with the respective site owners which gave them certain authority and control over the job sites. These contracts were admitted into evidence at trial. One of these subcontractors was Mario & DiBono, the asbestos spray contractor for Meadowbrook and for interior work at the WTC.
Maiorana worked at the WTC in 1969 and 1970 and at Meadowbrook from September 1969 until sometime in 1970 as a sheet metal worker for Alpine, a small sheet metal company no longer in operation, and another subcontractor. The Plaintiff's theory at trial was that the sheet metal workers, who worked alongside of and followed the work of the asbestos sprayers, were exposed to asbestos through contact with USMP's sprayed *1025 insulation, Cafco D. Maiorana was exposed to asbestos-containing dust which hung in the air and accumulated on the floor after a session of spraying.
Mario & DiBono began spraying Cafco D at the WTC in approximately August 1969. The Port Authority and Tishman banned the use of Cafco D at the WTC in April of 1970. USMP shipped Cafco D to Meadowbrook in the fall of 1969.
Maiorana was diagnosed as having colon cancer in January 1983, and he died from the disease six months later, on June 16, 1983. He was 40 years of age.

Discussion

I. The Standard for Judgment As a Matter of Law in the Second Circuit

USMP and all the Defendants allege that they are entitled to judgment as a matter of law. A motion for judgment as a matter of law should be denied unless, viewed in the light most favorable to the nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as the verdict that reasonable men could have reached." Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir.1993) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)); accord Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 889 (2d Cir.1988).
There must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" that a reasonable and fair-minded jurors could not arrive at a verdict against him. Samuels, 992 F.2d at 14; see also Mattivi v. South African Marine Corp., "Huguenot," 618 F.2d 163, 168 (2d Cir.1980). However, the court "`cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" Smith, 861 F.2d at 367 (quoting Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987)); see also Mattivi, 618 F.2d at 167.

II. Sufficiency of the Evidence

The standard for determining whether evidence is sufficient to create an issue of fact for the jury is a legal standard, but in determining it, the trial court must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor. See Samuels, 992 F.2d at 14. At issue here is the sufficiency of the evidence that Maiorana's exposure to asbestos was the proximate cause of his colon cancer. That evidence was exclusively scientific in nature.
A recent decision by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), clarified the standards for admitting scientific evidence. While there is no question in this case that the testimony of both sides' experts  all of whom possess impressive credentials  is admissible, certain passages in Daubert speak to the sufficiency required of scientific evidence and the gatekeeping role of the trial judge with regard to misleading evidence, ___ U.S. at ___, 113 S.Ct. at 2798-99. In other words, although Daubert focuses on the admissibility of the evidence, dicta in that opinion about the methods by which a trial court may determine the reliability of the evidence are instructive as well.
The recent decision in Daubert does not change the fundamental test of law, however. The evidence supplied by the Plaintiff at trial must be sufficient as a matter of law to show that Maiorana's exposure to asbestos was a proximate cause of his colon cancer.
To competently analyze the legal issues presented by this appeal, an understanding of the relevant scientific principles, albeit necessarily a rudimentary one drawn primarily from the relevant sources cited to by the parties, is essential.
DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 945 (3d Cir.1990). For this reason, the scientific evidence presented by both the Plaintiff and the Defendants is summarized and analyzed below to determine if the plaintiff presented sufficient evidence in support of her claim.

*1026 A. The Problem of Causation in Toxic and Carcinogenic Tort Actions
Courts employ no fewer than three distinct concepts of "cause": cause-in-fact, proximate cause, and causal linkage.[3] Cause-in-fact is but-for causation: it is the particular necessary condition[4] without which the event[5] causing the injury would not have occurred, to wit, if event x qua cause-in-fact occurs, then event y will follow. Proximate cause is more important from the legal perspective because it is the cause whose proximity in time and space qualifies it as the legally significant cause that is sufficient to sustain a cause of action in tort.[6] Causal linkage, in contrast, asserts a causal relationship between events x and y on the basis of statistical probability: if x occurs, there is probability p that event y will follow.
In the area of toxic and carcinogenic torts, the discussion of causation is substantially complicated by the importance of scientific hypotheses and theories in determining whether a causal relationship exists between person A being exposed to carcinogen c and subsequently developing disease d. The most straightforward concept of causation is that used to frame universal laws of the form: ceteris paribus for all occurrences of an event of type x, then an event of type y will necessarily follow.
Such universal causal relationships have been identified for certain "signature" diseases such as mesothelioma. The causal link between exposure to asbestos and mesothelioma has been demonstrated to such a high degree of probability, while at the same time few if any other possible causes have been identified, that if A is diagnosed as having mesothelioma and A was exposed to asbestos, A's exposure to asbestos is recognized to be the cause of A's mesothelioma.
Of course, in order to assert such a universal connection between events x and y, it is necessary to have a thorough understanding of the relevant physical mechanisms involved in the relationship. Obvious difficulties emerge when those mechanisms are complex and imprecisely understood. Simply subjecting A to clinical evaluation will not be sufficient because of the difficulty involved in excluding other possible causes and confounding factors that may be have caused or causally contributed to A's disease. In these cases, the scientist is compelled to frame hypotheses in terms of laws asserting a statistical probability that if x, then y, rather than a universal connection between the two events.[7] Thus, in addition to the aforementioned *1027 legal concepts of cause, the court is inevitably confronted with the myriad uses of the concept by scientists.[8]

B. Epidemiological Evidence
Epidemiology is a scientific discipline that by the very nature of its subject matter employs the concept of cause qua statistical probability. Useful hypotheses are framed, tested, refined, and used in identifying relations between one event, such as the exposure to carcinogenic substance c, and a subsequent event, such as the development of disease d. However, because the physiological, biological, and chemical mechanisms involved with c and d and the interaction between them are not sufficiently well-known for any single individual to frame a universal law regarding the causal relationship between c and d, the epidemiologist focuses on a group of persons or a "cohort" and assesses the statistical probability that a percentage of individuals in a given cohort will develop d after being exposed to c.
The Honorable Jack B. Weinstein has summarized the tasks and methods of the epidemiologist as follows:
Epidemiological studies rely on "statistical methods to detect abnormally high incidence of disease in a study population and to associate these incidence with unusual exposures to suspect environmental factors." In their study of diseases in human populations, epidemiologists use data from surveys, death certificates, and medical and clinical observations. Id.

In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1223, 1231 (E.D.N.Y.1985) ("Agent Orange II") (quoting Dore, A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact, 7 Harv. Envtl.L.Rev. 429, 431 (1983)).
The epidemiologist proceeds in two stages in analyzing the relationship between c and d: first, he determines whether a relationship between c and d is biologically possible; and second, if he concludes that it is, he then determines whether this relationship is causal in nature by considering whether there is a statistically significant association between the cohort's exposure to c and the outbreak of d in the cohort. This association is determined by using a mathematical formula that produces a ratio for the relative risk of contracting the disease:
The relative risk ratio is computed by dividing the observed number of cases of a particular disease for a particular time period (numerator data) by the expected number of cases of that disease for the same time period based on historical information not influenced by the event in question (denominator data).
A relative risk of [1.0] is the expected rate of contracting a disease in a population not influenced by the event under investigation. A relative risk of [2.0] means that the disease occurs among the population not subject to the event under investigation. Phrased another way, a relative risk of [2.0] means that, on the average, there is a fifty percent likelihood that a particular case of the disease was caused by the event under investigation and a fifty percent likelihood that the disease was caused by chance alone. A relative risk greater than [2.0] means that the disease more likely than not was caused by the event.

Manko v. United States, 636 F.Supp. 1419, 1434 (W.D.Mo.1986) (emphasis added), aff'd in part and rev'd in part, 830 F.2d 831 (8th Cir.1987); accord Asbestos Litig. I, 758 F.Supp. at 202-03.
Once a statistically significant percentage of a cohort is determined to have developed d following exposure to c, the epidemiologist can then evaluate the nature and scope of the causal link between c and d.
Nowhere is the imprecision confronting the epidemiologist clearer than that posed by the present state of scientific understanding of the causal relationships between environmental and occupational carcinogens and cancer.
The imprecision of estimating the impact of environmental and occupational carcinogens derives from the central uncertainty surrounding the nature of carcinogenesis. *1028 Like the study of toxicology in general, the lack of clear insights into the disease's molecular basis hampers the study of careinogenicity. Cancer biologists have developed useful hypotheses or carcinogenicity, some of which are now guiding potentially useful research. Nonetheless, the statement by a group of experts convened by the International Agency for Research on Cancer ... in 1980 remains true today: "the mechanisms by which chemicals induce cancer and the developmental stages from initial exposure to frank neoplasia are poorly understood."[9]
Scientifically valid links, therefore, will not always demonstrate the connection between the causal event and the harmful effect to establish a legally cognizable proximate cause which is sufficient to sustain or succeed in a tort action. While an epidemiologist might be inclined to conclude that a causal relationship exists between c and d, despite the fact that the relative risk ratio is ≤2.0, the "more likely than not" test, which a plaintiff must satisfy to sustain a cause of action in tort, is not satisfied by epidemiological evidence alone unless the plaintiff establishes that the relative risk ratio or, in the case of epidemiological studies of asbestos, the standardized mortality ratio ("SMR") between c and d is greater than 2.0. In other words, "at least a two-fold increase in incidence of the disease attributable to ... exposure [to asbestos] is required to permit recovery if epidemiological studies alone are relied upon." In re "Agent Orange" Prod. Liab. Litig., 597 F.Supp. 740, 785 (E.D.N.Y. 1984) ("Agent Orange I").

C. Clinical and Experimental Evidence
A plaintiff need not rely exclusively on epidemiological studies in support of her causation proof. A plaintiff may rely on conclusions derived from experimental studies involving animals or discrete groups of persons, or from clinical evidence including the medical, personal, and family history of the individual suffering from the disease.[10]
On the issue of clinical evidence, Judge Weinstein considered that courts were divided between "strong" and "weak" versions of the preponderance of the evidence of causation, Agent Orange II, 611 F.Supp. at 1260. Under the "strong" version, a plaintiff must offer both epidemiologic evidence that the probability of causation exceeds 50% in the exposed population and "particularistic" proof that the conduct complained of caused his individual harm. See id. Judge Weinstein considered the law in New York to require "strong" evidence of causation, see Miller v. National Cabinet Co., 8 N.Y.2d 277, 204 N.Y.S.2d 129, 168 N.E.2d 811 (1960), where the Court of Appeals concluded that the plaintiff's expert's unwillingness to say that plaintiff's exposure to benzene caused his leukemia as a matter of medical certainty, combined with the lack of statistical evidence of causation, was enough to dismiss the plaintiff's claim.
In the case at bar, the Court of Appeals noted that:
Maiorana's own medical records and personal history were the clinical evidence upon which plaintiff's expert witnesses based their opinions that asbestos exposure was a significant factor in causing his colon cancer. Plaintiff's experts used epidemiological studies as one basis for an expert opinion but did not rely solely on epidemiological evidence. Thus, plaintiff did not need to provide epidemiological evidence of a certain magnitude to defeat a summary judgment motion because she did not rely on epidemiological studies alone.
Asbestos Litig. II, 964 F.2d 92, 97 (2d Cir. 1992).
The Court of Appeals went on to conclude that it:
agreed with the observation that a "physician or other such qualified expert may view the epidemiological studies and factor out other known risk factors such as family history, diet ... or other factors which might enhance the remaining recognized *1029 risks, even though the risk study fell short of the 2.0 correlation." Grassis v. Johns-Manville Corp., 248 N.J.Super. 446, 591 A.2d 671, 675 (1991). Accordingly, an expert should be "permitted to testify respecting the bases for her causation opinion, including the epidemiological studies upon which she relied." Id., 591 A.2d at 676.
Asbestos Litig. II, 964 F.2d at 97.
However, Grassis has been interpreted by the New Jersey courts to require more rigorous scientific evidence than the opinion itself seems to indicate is necessary. In Dafler v. Raymark Indus., Inc., 259 N.J.Super. 17, 611 A.2d 136 (N.J.Sup.1992), and Landrigan v. Celotex Corp., 127 N.J. 404, 605 A.2d 1079, 1086 (1992), both cases where the only clinical evidence that asbestos caused colon cancer was differential diagnosis (i.e., the ruling out of other known risk factors), the court found that the medical testimony about the particular plaintiff was not the compelling source of testimony about causation. In Landrigan, both witnesses reviewed specific evidence about the decedent's medical and occupational histories, and:
[b]oth witnesses also excluded certain known risk factors for colon cancer, such as excessive alcohol consumption, a high-fat diet, and a positive family history. From statistical population studies to the conclusion of causation in an individual, however, is a broad leap.... Nonetheless, proof of causation in toxic-tort cases depends largely on inferences derived from statistics about groups.
Landrigan, 127 N.J. at 422, 605 A.2d 1079. Landrigan held that since a toxic tort victim might be compelled to report epidemiological evidence to prove causation, an expert's testimony on such causation should be permitted provided the expert's methodology was sound. Id. at 414, 422, 605 A.2d 1079. Other courts in New Jersey since Grassis have concluded the proof of causation in toxic tort cases rests essentially on the epidemiological evidence. See Dafler, 259 N.J.Super. at 36, 611 A.2d at 146 (citing Landrigan for the proposition that proof of causation may depend mostly upon inferences drawn from statistic evidence); Caterinicchio v. Pittsburgh Corning Corp., 127 N.J. 428, 433, 605 A.2d 1092 (1992) (referring to Landrigan standard where trial court must consider bases of and process by which expert witness reaches his conclusion, but reiterating proposition that epidemiological studies need not show a relative risk factor in excess of 2.0).
These cases uphold Grassis in the sense that they do not create a strict threshold for statistical evidence below which the case will not be considered, as the federal courts did in most of the Bendectin cases. However, they do admit that where the clinical evidence is merely an elimination of other possible known sources of cancer, such evidence is less than compelling, and under those circumstances, the plaintiff may be forced to rely on epidemiological evidence in order to establish causation.
It is also important to note that all three of the New Jersey cases concern summary judgment or the admissibility of testimony; they do not rule out the proposition that once the testimony is admitted, it may prove insufficient as a matter of law. Rather they support the proposition that epidemiological evidence should be admitted at trial because the plaintiff may be compelled to rely upon it, and they suggest that strictly clinical evidence would be insufficient for proof of causation as a matter of law. The question of sufficiency after all the evidence has been adduced is a different question from whether the evidence should be admitted or whether the action should be terminated through the mechanism of summary judgment.

D. The "More Likely Than Not" Test
Regardless of the kinds of evidence employed by a plaintiff in support of his causation proof in a carcinogenic tort action, the plaintiff must satisfy requirement of tort law that the purported cause was in fact more likely than not the actual cause of the injury in question. As Judge Weinstein has noted,
A government administrative agency may regulate or prohibit the use of toxic substances through rulemaking, despite a very low probability of any causal relationship. A court, in contrast, must observe the tort law requirement that a plaintiff establish a *1030 probability of more than fifty percent that the defendant's action injured him.
Agent Orange I, 597 F.Supp. 740, 785.[11]
Therefore, even though epidemiological evidence regarding the relationship between exposure to c and the development of d may fall short of the 2.0 threshold of statistical significance, if this evidence is combined with clinical or experimental evidence which eliminates confounding factors and strengthens the connection between c and d specifically in the circumstances surrounding the plaintiff's case of d, then the plaintiff's causation proof may be sufficient to support a jury's finding that it was more likely than not that the plaintiff's case of d was cased by his exposure to c.

E. Battle of the Experts
The traditional view was that determining whether scientific evidence was viable was a matter for the jury, not for the court. As long as the expert testimony was admissible under Rules 702[12] and 703,[13] Fed.R.Evid., and not more prejudicial than probative under Rule 403,[14] Fed.R.Evid., causation was an issue of weighing the evidence that was left to the jury. An example of the traditional approach can be found in a case where the plaintiff alleged that a herbicide, paraquat, which he handled in liquid form at work, caused his injury:
Plaintiffs' theory of recovery was thus that paraquat, when absorbed through the skin, can attack the lungs in such a way as to cause chronic and self-perpetuating inflammation. Chevron argues that there has never been any evidence or any suggestion that paraquat can cause chronic injury of this sort....
The short answer to Chevron's argument is that two expert witnesses refuted it and that the jury was entitled to believe those experts.... The experts on both sides relied on essentially the same diagnostic methodology; they differed solely on the conclusions they drew from the test results and other information. The case was thus a classic battle of the experts, a battle in which the jury must decide the victor.
Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1535 (D.C.Cir.1984); cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). The D.C. Court of Appeals summarized the proper deference to be given a jury's resolution of conflicting expert opinions in Ferebee:
Judges, both trial and appellate, have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low-level exposure to toxic chemicals with human disease. On questions such as these, which stand at the *1031 frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony.
736 F.2d at 1534.
Under this traditional view, provided the expert's credentials have been established, courts have been understandably reluctant to evaluate such testimony:
As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.
Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir.1987); see also Dixon v. International Harvester Co., 754 F.2d 573, 580 (5th Cir.1985); Graham v. Wyeth Lab., Div. Am. Home Prods. Corp., 906 F.2d 1399, 1404 (10th Cir.1990) ("the fact that Wyeth alleged that the evidence of causation was misconceived and that examined properly, the evidence would result in a finding of no causal connection between the DTP vaccine and [plaintiffs'] injury, is of no relevance"). Cf. Wilson v. Merrell Dow Pharmaceuticals, Inc., 893 F.2d 1149, 1155 (10th Cir.1990) ("When the evidence is in conflict, the jury alone has the power to weigh that evidence and assess the credibility of witnesses, and we will not retry the facts."); McMahon v. Eli Lilly & Co., 774 F.2d 830, 834-35 (7th Cir.1985) (jury is to decide whether to credit expert testimony regarding causal link between toxic chemicals and human diseases).
The courts' fidelity to this traditional standard of deference has cracked in the face of huge cases and huge jury awards based on doubtful or nonexistent scientific evidence. Expert evidence in toxic tort cases has led courts to superimpose or replace the standard of deference with a threshold of causation designed to eliminate a perceived abuse of expert testimony in the context of certain alleged toxins. Toxic tort litigation over Bendectin (a drug marketed until 1983 for morning sickness) alleged to cause birth defects, and over Agent Orange (sprayed as a defoliant in Vietnam) demonstrate the changes in the law. Even before the Supreme Court's recent decision in Daubert, ___ U.S. at ___, 113 S.Ct. at 2789-90, the increasing criticism of expert witnesses together with the close scrutiny given expert testimony in Agent Orange and the Bendectin cases has had an influence on expert testimony in general. See, e.g., Peter Huber, Galileo's Revenge: Junk Science in the Courtroom (1991). "The preliminary returns are in, and they are mixed. But a significant proportion of the cases accept Agent Orange and the Bendectin decisions as having tightened the evidentiary screws in toxic cases generally," Michael D. Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation, 86 Nw. U.L.Rev. 643, 671 (1992) [hereafter Green, Expert Witnesses].
The question has recently been considered by the Supreme Court in Daubert, whose holding requires the judge to make his own assessment of whether the methodology underlying the expert's opinion is fundamentally sound. Such a threshold evaluation of the expert's methodology, even though it still leaves the evaluation of the weight of the evidence to the jury, limits the "battle of the experts."

1. Agent Orange Litigation
In Agent Orange II, Judge Weinstein found the plaintiffs' evidence that the dioxin in Agent Orange caused their injuries insufficient as a matter of law because he found they needed epidemiological evidence to establish causal connections between dioxin and diseases in individual plaintiffs:
In a mass tort case such as Agent Orange, epidemiologic studies on causation assume a role of critical importance. Cf. In re Swine Flu Immunization Prod. Liab. Litig., 508 F.Supp. 897, 907 (D.Colo. 1981) ("(w)here ... the exact organic cause of a disease cannot be scientifically isolated, epidemiologic data becomes highly persuasive."), aff'd sub nom. Lima v. United States, 708 F.2d 502 (10th Cir.1983). Confronted with the reality of mass tort litigation, courts have been forced to abandon their traditional reluctance to rely upon epidemiological studies. Dore, A Commentary on the Use of Epidemiological *1032 Evidence in Demonstrating Cause-in-Fact, 7 Harv.Envtl.L.Rev. 429 (1983).
611 F.Supp. at 1240 (dismissing the claims of the opt-out plaintiffs on the merits).
In order to assess the accuracy of the conclusions of the plaintiffs' experts, Judge Weinstein reviewed in detail the major studies upon which the plaintiffs relied, after eliminating from his analysis those studies which did "not provide substantial support to plaintiffs because of their small size, self-selective nature and other defects." Agent Orange I, 597 F.Supp. at 787. Instead, Judge Weinstein focused on what he considered to be the two most significant studies, described in his opinion as the Ranch Hand Study, conducted by the Air Force, and the CDC Birth Defect Study, conducted by the Center for Disease Control. The Ranch Hand Study compared 1024 matched pairs of men for analysis and studied essentially all the veterans who had participated in the fixed wing spraying in Vietnam and who could be located. See id. at 788. Although the "report concludes that there is insufficient evidence to support a cause and effect relationship," Judge Weinstein noted that the study "offers no solace to either defendants or plaintiffs in the instant litigation. It simply seems inconclusive." Id. at 788.
Judge Weinstein analyzed the data compiled by the CDC Birth Defect Study in detail, including in his opinion tables which demonstrated that some indications of a slightly higher incidence of birth defects (such as cleft pallet or spina bifida) were counterbalanced by slightly lower incidence of others (such as cardiovascular defects). Judge Weinstein concluded that these "variations would not seem to be significant in a tort case such as the one before us." Id. at 790. An independent analysis of Australian veterans of the Vietnam war, also included in the CDC Birth Defects Study, revealed no increased risks of all types of birth defects. See Id. at 793. Independent reviews of the literature about dioxin prepared at the request of the Veterans' Administration and other studies "leave the reader with the conclusion that there may be some causal connection between Agent Orange exposure and present diseases," but nothing more. Id. at 794; see also In re "Agent Orange" Prod. Liab. Litig., 603 F.Supp. 239 (E.D.N.Y.1985) (claims of wives and children dismissed partly due to same lack of scientific evidence).
In Agent Orange II, Judge Weinstein decided the fate of the opt-out members of the class of the Vietnam veteran plaintiffs. He considered a number of additional studies in this opinion, including at least two which apparently were released after Agent Orange I. See 611 F.Supp. at 1240. However, Judge Weinstein did not examine the reports themselves again, but merely noted that the new studies echoed the inconclusive results of the studies already on the record. Comparing the scientific proof with the testimony of the plaintiffs' experts, however, led the court to conclude that in the absence of any direct proof of causation or of any medical examination of the plaintiffs, the plaintiffs' physicians were not able to testify that the studies were evidence of causation.

2. Daubert, Bendectin, and the Admissibility of Scientific Evidence

Agent Orange was filed and settled as a class action in the Eastern District of New York, and the plaintiffs' claims never went to trial. Litigation over the drug Bendectin, by contrast, took place around the country, and unlike the actions arising from Agent Orange in which the experts never examined the plaintiffs, it involved cases in which treating physicians testified that the plaintiffs' injuries were directly caused by the drug to a reasonable degree of medical certainty.
The Supreme Court has recently decided one of these cases. See Daubert, ___ U.S. at ___, 113 S.Ct. at 2789-90. The decision affirmed the role of the trial judge as "gate-keeper" on the question of the admissibility and effect of scientific evidence. Although it vacated the lower court decision on the standards for admitting evidence, the result of Daubert is a reflection of an emerging consensus in the courts, many of which are surveyed below.
The lower court decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 951 F.2d 1128 (9th Cir.1991), relied upon the Frye test to determine that the plaintiff's expert's reanalyses *1033 of epidemiological evidence on Bendectin was inadmissible evidence.[15] The decision in Frye v. United States, 54 App.D.C. 46, 47, 293 F. 1013 (1923), accurately characterized by the Supreme Court as "short and citation-free," Daubert, ___ U.S. at ___, 113 S.Ct. at 2792-93, held the results of a test by an early lie-detector machine inadmissible. Frye created what became known as the "general acceptance" test for the admissibility of evidence:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
Daubert, ___ U.S. at ___, 113 S.Ct. at 2792-93 (quoting Frye, 54 App.D.C. at 47, 293 F. at 1014).
The decision in Daubert kills Frye and then resurrects its ghost. The Supreme Court held that the Frye test for the admissibility of scientific evidence had been superseded by the enactment of the Federal Rules of Evidence, similar to the holding of the Second Circuit in United States v. Williams, 583 F.2d 1194 (2d Cir.1978), cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). However, the court made it clear that the Federal Rules of Evidence themselves place certain limits on the admissibility of purportedly scientific evidence, for "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, ___ U.S. at ___, 113 S.Ct. at 2795. The trial judge's function of determining the "reliability" of the evidence provides the mechanism for screening junk science.
Faced with a proffer of expert scientific testimony, then, the trial judge must [make] ... a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.... Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.
Daubert, ___ U.S. at ___, 113 S.Ct. at 2796. The Court isolated four: whether the expert's methodology had been tested, whether the theory or technique had been subjected to peer review and publication, whether the known or potential rate of error  here, the "confidence interval"  cast the results in doubt, and, finally, echoing Frye, whether the methodology meets with "general acceptance" in the scientific community.
The opinion does address the question of the sufficiency of the evidence:
[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment.... These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.
Daubert, ___ U.S. ___, 113 S.Ct. at 2798. The Supreme Court cited Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307 (5th Cir.) ("Brock I"), modified, 884 F.2d 166 (5th Cir.1989) ("Brock II"), reh'g denied, 884 F.2d 167 (5th Cir.1989) (en banc) ("Brock III"), cert. denied, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990), as an example of judgment appropriately granted as a matter of law based on insufficiency of the evidence.
In Brock I, the Court of Appeals for the Fifth Circuit held:

*1034 [o]ne certainly might infer from the evidence in the case that Bendectin causes birth defects, and further that Bendectin caused Rachel Brock's limb reduction defect  in fact, the jury concluded that this very thing occurred. However, the court must determine whether this is a reasonable inference to be drawn from the evidence presented.
874 F.2d at 309. The court modeled its logic on Judge Weinstein's opinion in Agent Orange II: "We are not without precedent in our approach to this problem. The case before us parallels in many respects the recently conducted Agent Orange Litigation." Brock I, 874 F.2d at 310; see also id. at 310 n. 11.
The Brocks' major evidence was a reanalysis by their expert of a previously conducted study which had found no increase in risk of birth defects due to Bendectin. After the plaintiffs' expert admitted that the confidence interval in his reanalysis made it statistically insignificant, the court noted that the plaintiffs' expert had not published his results for peer criticism and review.
While we do not hold that this failure, in and of itself, renders his conclusions inadmissible, courts must nonetheless be especially skeptical of medical and other scientific evidence that has not been subject to thorough peer review.... We find, in this case, the lack of conclusive epidemiological proof to be fatal to the Brock's case.
Id. at 313. The Brock court concluded that it hoped its decision would
have the effect of encouraging district judges faced with medical and epidemiological proof in subsequent toxic tort cases to be especially vigilant in scrutinizing the basis, reasoning, and conclusiveness of studies presented by both sides.
Id. at 315.
Upon rehearing, the court replaced its use of the phrase "conclusiveness of studies" with "statistically significant studies." Brock II, 884 F.2d 166, 167. Six of the judges dissented from the refusal of another rehearing en banc, maintaining that Brock I unavoidably changed the law:
Six highly qualified and experienced experts testified that Bendectin is a human teratogen, i.e. capable of causing human birth defects. Three of them testified to the opinion that Bendectin was a cause of Rachel Brock's deformation.... The panel['s] characterization of this voluminous expert proof as "speculation" could just as well doom virtually all expert testimony. The panel ... [even] enters into the debate with Dr. Glasser on the statistical significance of the Heinonen study....
Brock III, 884 F.2d at 168.
Brock I is an unusual case because it so broadly addressed the issue of toxic substances.
Acknowledging the traditional deference afforded medical experts, the court, echoing Judge Weinstein in Agent Orange, contended that toxic substances litigation is different and requires a more critical analysis of expert witnesses. By relying on Agent Orange and broadly addressing toxic substances, the court expanded the potential scope of its decision beyond the prior Bendectin opinions.... The effect of the panels' decision [in Brock III] was to make insufficient any expert's opinion not grounded in a statistically significant epidemiologic study. That may have been a meat-cleaver solution to expert witness abuse, but it surely is a solution, at least in the toxic substances arena.
Green, Expert Witnesses, at 666 & n. 107.
The Brock opinions were relied on by a district court granting judgment n.o.v. after a jury awarded $1,000,000 to a plaintiff who alleged the drug Accutane caused her seizures. See Thomas v. Hoffman-La Roche, Inc., 731 F.Supp. 224 (N.D.Miss.1989), aff'd, 949 F.2d 806 (5th Cir.1992). The trial court held that Brock required at least some "statistically significant epidemiological proof." 731 F.Supp. at 228.
In reaching his opinion that Accutane caused the 1984 seizures and neurological problems, it appears to the court that Dr. Mahalak relied primarily on his elimination of other causes.... In this regard the court must note that the opinion expressed [by four other doctors] that the seizures were viral in origin.
*1035 Id. at 227. In the opinion of the court, the absence of any meaningful testimony either providing an explanation of how Accutane could cause the seizures or epidemiological evidence that it did warranted setting aside the jury verdict and entering judgment in favor of the defendant.
The scrutiny recommended by the court in Brock I was extended by the Fifth Circuit to the admissibility of expert evidence in Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), where the plaintiff's expert had testified that the plaintiff's small-cell colon cancer (carcinoma) had to be the result of his exposure to toxic nickel and cadmium fumes because carcinoma of the lung was associated with such fumes. The court affirmed the trial court's exclusion of this testimony, absent any proof of scientific evidence of causation, by holding that the methodology or reasoning that the expert uses to connect the facts to his conclusion must be generally accepted within the relevant scientific community, a conclusion which under Daubert is now only part of the test for the reliability of evidence.
In the D.C. Circuit, which allowed the novel claim of injury due to paraquat in Ferebee, the validity of the scientific evidence was invoked in cases where the court refused to follow Ferebee for claims based on exposure to Bendectin:

Ferebee stands for the proposition that courts should be very reluctant to alter a jury's verdict when the causation issue is novel and "stand[s] at the frontier of current medical and epidemiological inquiry....
The case before us, however, is not like Ferebee. Indeed, we are at the other end of the spectrum, a great distance from the `frontier of current medical and epidemiological inquiry.' And far from a paucity of scientific information on the off-asserted claim of causal relationship of Bendectin and birth defects, the drug has been extensively studied and a wealth of published epidemiological date has been amassed, none of which has concluded that the drug is teratogenic. Uniquely to this case, the law now has the benefit of twenty years of scientific study, and the published results must be given their just due.
Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 832 (D.C.Cir.1988), cert. denied, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989).
The court in Richardson reviewed the epidemiological evidence in order to determine whether the plaintiff's physician's opinion had an adequate basis. After eliminating the chemical, in vitro, and in vitro studies as inadequate (as Judge Weinstein had done in Agent Orange I, 597 F.Supp. at 782-95, and Agent Orange II, 611 F.Supp. at 1241) the court looked at the epidemiological studies showing the effects of Bendectin and rejected the results as the Fifth Circuit had done in Brock I:
[T]he plaintiff's expert] further admitted that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb reduction defects of the type at issue in this case. Only by recalculating the data was [plaintiff's expert] able to obtain what he deems a statistically significant result. Moreover, the studies rejected by [plaintiff's expert] had been published in peer-reviewed scientific journals, while [the expert] has neither published his recalculations nor offered them for peer review.
Richardson, 857 F.2d at 831.
After Richardson, in Ealy v. Richardson-Merrell, Inc., 897 F.2d 1159 (D.C.Cir.1990), cert. denied, 498 U.S. 950, 111 S.Ct. 370, 112 L.Ed.2d 332 (1990), the Court again distinguished Ferebee in overturning a jury award of $20,000,000 in compensatory damages and $75,000,000 in punitive damages to a plaintiff despite the complete lack of scientific proof that Bendectin actually caused the type of harm alleged:
The Richardson court concluded, as a matter of law, that the "wealth of published epidemiological data ... none of which has concluded that the drug is teratogenic ... must be given their just due." ... [U]nder Rule 703, an opinion refuting this scientific consensus is inadmissible for lack of an adequate foundation, in the absence of other substantive probative evidence on *1036 which to base this opinion. It is this uncontroversial rule of evidence that is the ratio decidendi of Richardson and this case.
Ealy, 897 F.2d at 1162.
However, the D.C. Court has emphasized that the logic in the Bendectin cases applies only to cases where the science is "far from the frontier of current medical and epidemiological inquiry." Richardson, 857 F.2d at 832. Experts who allege a factual basis for their conclusion must be allowed to testify as long as the trial court can verify that their methodology is sound. In Ambrosini v. Labarraque, 966 F.2d 1464 (D.C.Cir. 1992), where the plaintiff alleged damages from Bendectin and another progesterone, Depo-Provera, and the Court held admissible expert testimony which the plaintiff had merely promised was based on "the available scientific epidemiological data concerning progestin and progesterone agents." Id. at 1470. The Court held that the plaintiffs should be given their chance to prove causation, but it cautioned that "[t]he Ferebee court noted the difference between expert opinion based on controversial techniques or methods and expert opinion based on well-founded methods but which reaches a novel, and perhaps controversial, conclusion." 966 F.2d at 1467.
In Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992), the Sixth Circuit affirmed summary judgment dismissing Bendectin litigation on the ground that the scientific evidence of causation was simply too insufficient as a matter of law, as the Fifth Circuit did in Brock:
[A]lthough judges should respect scientific opinion and recognize their own limited scientific knowledge, nevertheless courts have a duty to inspect the reasoning of qualified scientific experts to determine whether a case should go to the jury. Based on the record before us, we also agree with Judge Siler that whether Bendectin caused the minor plaintiff's birth defects is not known and is not capable of being proved to the requisite degree of legal probability based on the scientific evidence currently available.
Turpin, 959 F.2d at 1350.
In arriving at its holding, the Sixth Circuit examined six representative studies of the more than 85 studies of Bendectin that it found in medical and scientific journals. The Court of Appeals repeated the relevant statistical information about each study in its opinion, including the sample size in each of the relevant studies, the names of the researchers and place of the publication of the research, confidence intervals, and whether the study was considered "statistically significant."
The Court of Appeals affirmed entry of summary judgment for the defendants because:
the plaintiffs' experts stop short of testifying that Bendectin more probably than not caused the birth defects in babies. They stop short because they have no factual or theoretical basis for a stronger hypothesis.... The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue of human birth defects is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation.
Id. at 1360-61.
In Lynch v. Merrell-Nat'l Lab. Div. of Richardson-Merrell, Inc., 646 F.Supp. 856 (D.Mass.1986) ("Lynch I"), aff'd, 830 F.2d 1190 (1st Cir.1987) ("Lynch II"), the court examined eleven cohort studies and four case control studies of epidemiological evidence, none of which demonstrated a statistically significant association between Bendectin and birth defects. These results were confirmed by epidemiological studies of population groups, including one which indicated that, while Bendectin usage declined from more than one million in 1979 to zero in 1984, there was no change in the incidence of limb reduction defects. Finally, a combined estimate of the relative risk for ten of the cohort studies found no statistical difference between the rate of birth defects among those exposed and those not exposed.
The only epidemiological evidence offered by the plaintiffs is a re-analysis ... criticizing a study ... of the Center on Disease Control, and attempting to realign the data *1037 in the original study to demonstrate causal connection between Bendectin and birth defects.... Even if this Court were to find the methodology of ... re-analysis credible, this Court still could not accept result-oriented re-analysis of epidemiological studies and criticisms of others' methodology ... as reliable data upon which to base on opinion on causation. The plaintiffs cannot merely rely on criticisms of the defendants' studies to establish causation.
Lynch I, 646 F.Supp. at 865.
In affirming the decision, the First Circuit added:
On the basis of the epidemiological evidence to date, Bendectin is as likely as aspirin to cause limb reduction.... The ignorance that prevails as to the etiology of most birth defects does not mean causation in a given case could not be proven; it does mean that there is a large terra incognita where gossip and guesswork abound, so that courts must carefully control the basis for testimony pointing to a particular cause.... The plaintiffs offered no new study [demonstrating that Bendectin caused their harm].
Lynch II, 830 F.2d at 1194.
Against this background of the state of law and accepting as axiomatic that without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not sufficient to sustain a jury's verdict, see Viterbo, 826 F.2d at 424, the epidemiological, clinical, and experimental studies testified to at trial by the Plaintiff's experts must be carefully scrutinized to determine whether they are, in fact, sufficient.

III. The Plaintiff's Causation Proof

A. The Sufficiency Criteria: Evaluating The Sufficiency Of The Plaintiff's Epidemiological Evidence
As has been noted, if an epidemiological study reveals that the SMR[16] between exposure to carcinogen c and the subsequent development of disease d in a cohort is greater than 2.0, that SMR is statistically significant and supports the conclusion that c and d are causally linked. This statistical conclusion also justifies the proposition that it is more likely than not that individual A's exposure to c is the cause d in A. However, this is not the end of the analysis to determine whether the Plaintiff's causation proof is sufficient to withstand the Defendants' motions for judgment as a matter of law. There are several additional criteria that have to be taken into consideration in assessing the conclusions of an epidemiological study to determine the soundness of an allegedly statistically significant SMR.
In order to assess fully the accuracy of the conclusions offered in an epidemiological study regarding a purported causal relationship between exposure to c and the subsequent development of d, several factors must be considered.[17] The SMR is only one of these factors, and it defines the strength of the possible association between exposure to c and the development of d. In addition to considering the SMR, the following five factors must be analyzed to assess accurately whether or not evidence has achieved the status of scientific knowledge (collectively, the "Sufficiency Criteria"): first, the consistency of the association between c and d, which raises the question, Is the SMR of a single epidemiological study addressing the relationship between c and d consistent with the SMRs derived in other epidemiological studies?[18]; second, the dose-response relationship between c and d: What is the epidemiological response in a cohort to estimated doses of c?; third, the results of experimental studies: Have experimental studies been conducted on animals, for example, and if so, were they positive?; fourth, the plausibility *1038 of there being a biological link between c and d: Given the biological and chemical mechanisms involved, what is the degree of probability that exposure to c can give rise to the subsequent development of d?; and fifth, the coherence between c and d: How many "confounding" or alternative factors or conditions can contribute to the development of d in A? And how difficult is it to exclude these confounding conditions thereby isolating A's exposure to c as the statistically significant and "more likely than not" cause of d in A?[19]
While none of the Sufficiency Criteria is decisive by itself in determining the sufficiency of a plaintiff's epidemiological evidence in the context of a Rule 50(b) motion, sufficient epidemiological evidence will necessarily satisfy several of these criteria. More significantly, when epidemiological evidence fails to satisfy any of the Sufficiency Criteria, it cannot be relied on to support a jury verdict in the face of a motion for judgment as a matter of law.

B. The Epidemiological Evidence
When the Sufficiency Criteria are applied to the epidemiological evidence offered at trial by the Plaintiff's experts, the Plaintiff's causation proof only weakly satisfies the plausibility criterion and fails to satisfy the of the other Sufficiency Criteria. Therefore, the Plaintiff's proof fails to support the jury's conclusion that Maiorana's exposure to asbestos was the proximate cause of his colon cancer, and the Defendants' Rule 50(b) motions must be granted.

1. Strength and Consistency of Association
Of course, the stronger and more consistent an association, the more likely, it represents a cause-and-effect relationship.
Weak associations often turn out to be spurious and explainable by some known, or as yet unknown, confounding variable. In order for an association to be spurious, the underlying factor that explains it must have a stronger relationship to the disease than the suspected causal factor. When the causal factor under consideration is strongly related to the disease, it is likely, although not certain, that the underlying variable with the necessarily even stronger relationship to the disease would be recognizable.
Strength of association is usually measured by the relative risk or the ratio of the disease rate in those with the factor to the rate in those without. The relative risk of lung cancer in cigarette smokers as compared to nonsmokers is on the order of 10:1, whereas the relative risk of pancreatic cancer is about 2:1. The difference suggests that cigarette smoking is more likely to be a causal factor for lung cancer than for pancreatic cancer.
Landrigan, 127 N.J. at 416, 605 A.2d 1079.
Consistency is measured by comparing the association between a purported cause and effect identified in one study with the results of other studies and with other relevant scientific knowledge.
During the course of the trial, approximately 45 epidemiological studies and surveys of studies were discussed by the parties' experts, by Drs. Steven Markowitz ("Markowitz"), Carl Shy ("Shy"), and Kenneth Smith[20] ("Smith") for the Plaintiff and by Dr. Edward Gaensler ("Gaensler") for USMC.
*1039 Markowitz testified that, although there is nothing pathologically in the colon cancer tumor cell itself which would identify it as being caused by asbestos, asbestos fibers have been found in the colon cancer tissues of some asbestos workers who developed that disease. Markowitz's opinion was based on the findings reported by Albert Ehrlich, who studied a cohort which included 44 asbestos workers who had developed colon cancer.[21] Of those 44 workers, Ehrlich found asbestos fibers in the cancerous tissue of 14 of them. See Trial Tr. at 186. However, this consideration was irrelevant because there was no finding in the pathology reports at issue here that there were asbestos fibers in Maiorana's tumorous tissues.[22]
In his direct testimony, Markowitz noted that between 20 and 30 epidemiological studies had been conducted that examined the relationship between exposure to asbestos and the development of lung and colon cancer. Markowitz focused on a 1985 study by Zoloth and Michaels in which they asserted that sheet metal workers exposed to asbestos faced an "approximately two-fold increase" in the risk of developing colon cancer.[23] This study was based on 385 deaths among members of a sheet workers union local. Markowitz acknowledged that this study was methodologically flawed but noted that to his knowledge "it's the only direct study of sheet metal workers and colon cancer." Trial Tr. at 191.
In a follow-up study, however, Zoloth and Michaels found that, while exposure to asbestos appeared to be causally linked to significantly elevated proportional mortality ratios for all malignant neoplasms, as well as for cancers of the stomach, liver, lung, and lympathic tissue, the ratio for colon cancer was statistically non-significant.[24]
Markowitz testified that when Maiorana underwent surgery, during which his colon was resected, two areas of polypoid mucosa were found. Although he acknowledged that polypoid mucosa is distinct from polyps, Markowitz discussed the relationship between polyps and the development of colon cancer, noting that polyps constitute a risk factor and were associated with a stage in the development of colon cancer.
In support of his analysis, Markowitz referred two studies involving humans, one by J.C. McDonald,[25] the other by Alfred Neugut.[26] Markowitz summarized Neugut's findings as follows:
more people who had polyps had a[n] occupational history of working in a trade associated with exposure to asbestos than did the people without polyps, and calculated that there was an approximate four-fold increase in risk to get a polyp if there is an occupational history of exposure to asbestos.
Trial Tr. at 233.
In contrast to Markowitz's summary of Neugut's study in definitive terms, Neugut himself advances only tentative and limited conclusions from his cohort regarding the relationship between asbestos exposure and polyps:
To date, no one has examined the relationship between asbestos exposure and the occurrence of colorectal adenomatous polyps.
While the sample sizes were relatively small for both case groups, an elevated risk was observed for those with a history of significant asbestos exposure. If true, *1040 this elevation would suggest that asbestos acts as a carcinogen at a fairly early stage (prior to the development of adenomatous polyps) in the colon carcinogenesis pathway....
Nonetheless, one must regard these findings as preliminary. The odds ratios were significant only at the 0.05 to 0.10 levels.[27]
On cross-examination, Markowitz explained that he arrived at his conclusion from Neugut's analysis by "extrapolation," Trial Tr. at 288, and the weakness of this extrapolation was evident in Markowitz's summary of his position in his direct testimony:
One risk factor is his occupational history of exposure to asbestos, a sheet metal worker. He also had these two areas of mucosal abnormality, polypoid mucosa, which may well present a risk factor. These may in turn be caused by asbestos. There's limited evidence of that. It's not exactly clear, but they may well be caused by asbestos.
Trial Tr. at 235.
In light of Neugut's qualifications regarding the causal relationship between asbestos and polyps, and in light of the fact that the condition of polypoid mucosa is even further removed in the tentatively asserted causal chain between asbestos exposure and colon cancer than are polyps, it is not surprising that Markowitz conceded on cross-examination that he could not state with reasonable medical certainty that the condition of polypoid mucosa generally, or Maiorana's polypoid mucosa in particular, was caused by asbestos exposure.[28]See Trial Tr. at 290.
Markowitz attempted to extrapolate from McDonald's findings in a similar manner. McDonald studied the rates of cancer in workers exposed to asbestos dust in the processes of mining and milling chrysotile asbestos and concluded that "the lung cancer risk was increased at 1.25 or 125, which is statistically significant...." Trial Tr. at 192. From the conclusion that asbestos causes lung cancer, Markowitz made the assumption that lung cancer could be used as a substitute for exposure to asbestos, and armed with that assumption, Markowitz asserted that it could be expected that the correlation between the incidence of lung cancer and colon cancer is statistically significant. The fatal flaws inherent to this assumption are discussed below in the analysis of the Sufficiency Criterion of the dose-response relationship. For the purposes of Sufficiency Criteria of strength and consistency of association it suffices to note that Markowitz conceded on cross-examination that McDonald's study does not support the conclusion that asbestos exposure causes polypoid mucosa.
In addition to the studies already mentioned, Markowitz based his conclusion that Maiorana's colon cancer was caused by his exposure to asbestos on a number of studies that showed an increase in the rate of colon cancer in cohorts exposed to asbestos. However, Markowitz acknowledged under cross-examination that the increases yielded in these studies were not statistically significant.
Of the various studies discussed by the Plaintiff's experts that included calculations of SMRs for colorectal cancer, only three yielded SMRs that were significantly high. In their study of 12,051 U.S. and Canadian insulation workers who were first exposed to asbestos 20 or more years before they were diagnosed with colorectal cancer, Selikoff, Hammond, and Seidman expected 34 occurrences of the disease but actually observed 55 occurrences for an SMR of 1.62.[29] In *1041 their subsequent study of amosite asbestos factory workers, Seidman and Selikoff, joined this time by Gelb, studied 820 workers in a New Jersey asbestos factory.[30] While 11.9 occurrences of colorectal cancer were expected in this cohort, 22 were observed, for an SMR of 1.85.[31] Finally, in their 1991 study of insulation workers in the United States and Canada, Selikoff and Seidman evaluated their largest cohort, consisting of 17,800 workers, and derived a statistically insignificant SMR of 1.37.[32]
A third study yielded a statistically significant SMR of 2.27 for colon cancer appearing in workers at a nitric acid production plant where they were exposed to varying levels of asbestos.[33] 2.2 occurrences of colon cancer were expected and 5 were observed.[34] These five cases of colon cancer occurred 15, 27, 30, 31, and 35 years after the first exposure.[35]
When taken together, the SMRs of these studies are statistically significant and, at first glance, appear to support the Plaintiff's contention that there is a causal relationship between exposure to asbestos and colon cancer. However, to assess accurately the strength of these studies, they must be considered within the broader context defined by the other epidemiological studies in which SMRs for colorectal cancer have been calculated. It is only by taking this next step of comparative analysis that one can determine the degree to which the Plaintiff's asserted causal linkage between exposure to asbestos and colon cancer satisfies the Sufficiency Criteria of strength and consistency of association and is supported by all relevant epidemiological studies.[36]
In support of the Plaintiff's causation claim, eight studies reveal an apparent increased risk in contracting colorectal cancer from exposure from cancer with SMRs for colorectal cancer ranging from 1.14 to 1.47.[37] While an SMR of less than 1.50 is statistically insignificant, Markowitz asserted that these studies, when taken together, reveal a pattern of causation which is statistically significant. The fact that these studies consistently yielded colorectal cancer SMRs greater than 1.0 indicated, in Markowitz's opinion, that there is a causal link between exposure asbestos and colorectal cancer.
The plausibility and ultimately the sufficiency of the conclusion of the Plaintiff's causation proof is undermined by two considerations: *1042 First, no matter how many studies yield a positive but statistically insignificant SMR for colorectal cancer, the results remain statistically insignificant. Just as adding a series of zeros together yields yet another zero as the product, adding a series of positive but statistically insignificant SMRs together does not produce a statistically significant pattern.
Second, 10 studies discussed by Markowitz and Gaensler yielded low colorectal cancer SMRs, suggesting the startling proposition that exposure to asbestos may actually decrease the risk of developing colorectal cancer.[38] However, because these low SMRs are just as statistically insignificant as the aforementioned high SMRs, the suggestion that asbestos exposure may be beneficial and decrease the risk of colorectal cancer is as unjustified as the Plaintiff's contention that it increases that risk.
The remaining study, which analyzed cancer rates in workers who were exposed to asbestos in the process of manufacturing gas masks, was inconclusive with regard to the alleged causal linkage between asbestos exposure and colorectal cancer. No unexpected occurrences of colorectal cancer were observed in the cohort of 1327 women.[39]
On the record before the jury at trial, the various epidemiological studies relied on in the Plaintiff's causation proof establishes only the conclusions that the association between exposure to asbestos and developing colon cancer is, at best, weak, and that the consistency of this purported association across the studies is, at best, poor.[40] This is particularly true of the results generated by those studies which had the largest cohorts and therefore, are statistically the most powerful and compelling.[41]
This conclusion was supported not only by the testimony of the Defendant's experts, but also by reviews of the epidemiological studies in question which were testified to at the trial and discussed by Markowitz and Shy. D.A. Edelman analyzed the results of studies involving 32 independent cohorts of asbestos workers and "found no consistent statistical association between exposure to asbestos and gastrointestinal cancer...."[42] William Weiss concluded from his review of studies on 21 cohorts, in which he focused specifically on the possible causal relationship between asbestos and colorectal cancer, that those studies failed to satisfy the consistency criterion and had showed only little strength of association.[43] Weiss' analysis yielded summary *1043 SMRs[44] of 0.90 among "inception" cohorts and 1.14 among "cross-sectional" cohorts,[45] neither of which differed in a statistically significant manner from 1.00.[46] Similarly, a review of more than 45 cohort studies by Robert Morgan, Donna Foliart, and Otto Wong concluded that the summary SMR for colorectal cancer was 1.13, and that the SMR dropped to 1.03 once the correction was made of deleting "best evidence" data.[47] And finally, Howard Frumkin and Jesse Berlin's review of studies involving 31 cohorts, concluded that the total summary SMR for colorectal cancer was only 1.11.[48]
These reviews, each of which was acknowledged by Markowitz and Shy, seriously undermine their shared claim regarding the probability that there is a causal linkage between asbestos and colorectal cancer. The Plaintiff's causation proof simply does not satisfy the Sufficiency Criteria of strength and consistency of association between A's exposure to asbestos and the subsequent development of this kind of cancer in A. On cross-examination, Markowitz and Shy acknowledged that all of the reviews came to the same conclusion, namely, that there is no statistically significant increase in the rate of colorectal cancer as a result of exposure to asbestos.
Finally, neither Markowitz nor Shy disputed the findings of David Garabrant in his recent study of 746 confirmed cases of colon cancer, which focused specifically on the relationship between asbestos exposure and colon cancer.[49] Garabrant concluded that, even when no attempt is made to correct for possible confounding factors which inevitably inflate the SMR, the association between asbestos and colon cancer is extremely weak and statistically insignificant 1.14.[50]
The Plaintiff's epidemiological evidence failed to satisfy the Sufficiency Criteria of strength and consistency of association and, as such, failed to contribute to the sufficiency of her proof on the issue of causation.

2. Dose-Response Relationship
The critical assumption in Markowitz's evaluation of the epidemiological literature, upon which his expert opinion regarding Maiorana's death was based, was that lung cancer rates can be used as a substitute *1044 measure for a cohort's exposure to asbestos, and Shy suggested that "[t]he dose-response relationship is the ... most important criterion for establishing causality...." Trial Tr. at 1493. However, the Plaintiff's evidence presented at trial demonstrated that the dose-response relationship between asbestos and colorectal cancer is erratic at best. The practical problem of satisfying the Sufficiency Criterion of the dose-response relationship was succinctly stated by Gaensler:
Nobody knows exactly anything about dose response because the times when all of these things happened were 20 and 30 and 40 and 50 years ago, when the measurements of dust were totally different, expressed in different terms, and when for the most part no measurements were made at all.
Trial Tr. at 1827.[51]
This conclusion on the issue of a determining the dose-response relationship is consistent with those arrived at in the various surveys of the epidemiological literature with the exception of Frumkin and Berlin's metaanalysis of various epidemiological studies.[52] Frumkin and Berlin attempted to examine the effect of dosage on the total cohort, and it was their meta-analysis that appeared to support the position of Markowitz and Shy.
One obvious problem with epidemiological studies generally is that there is virtually no data available regarding the doses of asbestos exposure in the studies. To surmount this difficulty, Frumkin and Berlin divided the studies they considered into two categories, namely, those with a lung cancer SMRs greater than 2.0 and those with lung cancer SMRs less than 2.0.[53] They use the lung cancer SMR as a surrogate for dosage by treating cohorts with lung cancer SMRs less than 2.0 as having low asbestos exposure.
According to their results, those cohorts having a statistically significant lung cancer SMR of greater than 2.0 have a summary colorectal cancer SMR of 1.61.
While this 1.61 SMR appears to approach the level of statistical significance and to support the conclusion that there is a dose-response relationship between asbestos and colorectal cancer, Frumkin and Berlin's methodology, assumptions, and conclusions have attracted serious criticism. Two criticisms are most damaging: first, this meta-analysis is based on the assumption that Markowitz filed to justify, namely, that the same mechanism underlies both lung and colorectal cancer; and second, "[i]t is highly likely that cohorts in which plural mesothelioma is misdiagnosed as lung cancer will also have peritoneal mesothelioma misdiagnosed as digestive cancer, creating a false correlation between digestive cancer and lung cancer."[54]
Frumkin and Berlin's methodology and conclusions appear to be arbitrary and flawed in light of the "seemingly improbable observation in their data that low levels of asbestos exposure appear to protect against all gastrointestinal cancer, especially stomach and colorectal"[55] and of the total colorectal SMR of all cohorts amounting to a statistically *1045 insignificant 1.11.[56] Furthermore, as Shy acknowledged, this meta-analysis failed to account for the effect of smoking in the development of lung cancer. This is particularly significant because, as Shy testified, asbestos workers as a group have had a higher incidence of smoking than the general population.
Given the insurmountable difficulties in satisfying the Sufficiency Criterion of dose-response relationship, Edelman's conclusions are appropriate: There is "no consistent statistical association between exposure to asbestos and gastrointestinal cancer, a dose response relation was not apparent,"[57] and "[a]lthough the data from some studies suggest dose-response relations, they are most probably an artifact of the way in which accumulated dose was measured."[58] Significantly, these conclusions are consistent with the Plaintiff's causation proof presented at trial and reflect the Plaintiff's failure to satisfy the Sufficiency Criterion of dose-response relationship.

3. Experimental Evidence
Although the failure to demonstrate pathological changes in animals after exposure to asbestos does not negate other evidence supporting the assertion of causal linkage, successful demonstrations of changes similar to those seen in humans would strengthen the claim for causation.[59]
Markowitz testified that studies on the cancer-causing effects of asbestos in animals have been conducted through the government-sponsored National Toxicology program. He summarized these results as follows:
Specifically, [adenomatous] polyps, which are the most common variety, and the one that are closest related to a risk of developing colon cancer, that the animals developed these polyps [at] a greater rate than the control group did, it was about a ... five- or six-fold increase....
Trial Tr. at 234. Markowitz also referred to the work of Kelly Donham to support this thesis.
In fact, the experimental evidence, including Donham's research, fails to establish any causal relationship between exposure to asbestos and the development of cancer in animals. Most notably, rats that were orally fed asbestos showed no pathological changes that would satisfy the Sufficiency Criterion of positive experimental evidence.[60] Markowitz conceded this on cross-examination with regard to Donham's findings and with regard to vast bulk of the experimental data on the subject.
Markowitz acknowledged the results of Lyman Condie's survey of the experimental findings of 11 published studies.[61] Condie concluded that:
The bulk of the experimental evidence indicates that the long-term, high-level ingestion exposure to various types of asbestos fibers failed to produce any definite, reproducible, organ-specific carcinogenic effect.... These studies also cast some doubt on the hypothesis that peritoneal mesotheliomas and gastrointestinal cancers result from the ingestion of asbestos fibers cleared from the lungs following inhalation exposure.[62]
*1046 In response to Condie's review, Markowitz could identify only one study in support of his position, to wit, a 1985 technical report by McDonald which fails to establish a statistically significant relationship between exposure to asbestos and cancer in animals. Markowitz asserted that McDonald's study was more compelling because it was one of the more recent studies conducted. However, Markowitz also acknowledged that the 1989 study by Truhaut and Chouroulinkov concluded that ingestion of asbestos fibers at high doses had neither a toxic nor a carcinogenic effect in rats and did not affect animal survival.[63]
Thus, no support for the claim that asbestos and colorectal cancer are causally related is forthcoming from experimental evidence gathered from studies of both animals and humans, and the Plaintiff's attempt to establish such a claim failed to contribute to the sufficiency of the causation proof.[64]

4. Plausibility
While there is no doubt that asbestos causes cancer[65] and that there is a possible causal linkage between exposure to asbestos and colorectal cancer, the present state of scientific knowledge as presented by the Plaintiff at trial, as previously discussed, does not support the conclusion that this relationship is anything more than possible. Such a showing falls short of satisfying the Sufficiency Criterion of plausibility and fails to contribute to the sufficiency of the Plaintiff's causation proof in the face of the motions for judgment as a matter of law.

5. Coherence
"Coherence requires that the hypothesis of causality fits with the known facts in the natural history and biological character of the disease."[66] In the context of toxic and carcinogenic torts generally, the issue of coherence turns on the plaintiff's ability to eliminate alternative or confounding causes which may have been the actual cause of the disease in question.
The Sufficiency Criterion of coherence can be satisfied either by using epidemiological evidence to establish that there are no (or at least, very few) confounding factors or by using clinical evidence regarding the individual's specific medical and personal history to eliminate the possibility that one or more of the various confounding factors were more likely than not to have caused the disease. Of course, a plaintiff necessarily employs a combination of epidemiological and clinical evidence in establishing causation.[67]
Unlike the signature disease mesothelioma, colon cancer has various known confounding conditions. Thus epidemiological evidence alone is insufficient to establish the requisite causal relationship, and at trial, *1047 the Plaintiff was forced to rely heavily on clinical evidence in her attempt to establish causation. As Markowitz testified, cancers are normally thought to be causally "multi-factorial" in nature. Trial Tr. at 236.
[I]n general cancer as well as other chronic diseases are thought to have a number of causes, even within the same individual. For instance, a person who develops heart disease, say with a heart attack, frequently that person will have a problem with cholesterol, and a problem with high blood pressure and diabetes. These risk factors often run together.
Id. at 237. From this overview of the problem of coherence for cancer generally, Markowitz asserted the existence of a specific causal link between asbestos and colon cancer in his suggestion that "[m]ost people who are exposed to any particular agent do not develop the cancer. So clearly those that do, the agent played, a role." Id. However, the epidemiological evidence proffered by the Plaintiff and discussed by Markowitz and Shy does not support this conclusion.

a. Epidemiological Evidence
On cross-examination, Markowitz acknowledged that asbestos is not considered to be a risk factor for colon cancer. Exposure to asbestos is not included on the various diagnostic lists of factors causing colon cancer published by important authorities in the medical field. Rather, a high-fat and/or low-fiber diet, inflammatory bowel disease, streptococcus bovis bacteremia, ureterosigmoidostomy, and hereditary syndromes such as polyposis coli and non-polyposis syndrome are recognized as significant confounding factors for colon cancer.[68]
Markowitz testified that Weiss' 1990 review of 21 cohorts led Weiss to conclude that there was no increase in colorectal cancer from exposure to asbestos. In rejecting the hypothesis that colorectal cancer is causally linked to exposure to asbestos, Weiss notes that there is simply no coherence between exposure and the disease:
The descriptive epidemiology of colorectal cancer includes the observation that its incidence in the United States increased in men over the past four decades only in those aged 65 years and older when the incidence actually decreased among those aged less than 45 years. Overall mortality rates declined from 1950 to 1980. These facts are not consistent with the marked increase in asbestos consumption in the United States from 1940 to 1970, given the long latency period for colorectal cancer, if it is postulated that asbestos made a substantial contribution to this type of cancer in the form of occupational exposure....
Although there is a recent report of the presence of asbestos bodies and fibers in digested colon and mesentery samples from a case of asbestosis and adenocareinoma or the colon, it establishes only site-specific evidence of exposure, not causation.
Among insulators, the relative risk for gastrointestinal cancer ... was 1.58. However, the relative risk was just as high 7.5 years after the onset of exposure to asbestos as it was later.... This pattern was quite different from the pattern in lung cancer relative to risk, which rose to a peak in the fourth decade after the onset of exposure and declined thereafter. The data for gastrointestinal cancer suggests an induction-latency period of less than 10 years with no increase after that, an idea which is biologically implausible for solid tumors and the known increase of colorectal cancer incidence with increasing age.[69]
The simple fact is that numerous confounding factors which, when considered in light of the long latency period for colon cancer, conceal the inner workings of the biological and chemical mechanism relevant to the development of colon cancer.
These facts present tremendous difficulties for every epidemiological study. Thus, as Edelman notes: "Although various factors associated with an increased risk of gastrointestinal cancer have been identified, none of *1048 the 32 studies made any adjustments to the risk estimates for any of these factors."[70] The result is that the colorectal SMRs in these and every other study are necessarily inflated by of the inclusion of occurrences of cancer that are actually caused by these other factors. Therefore, if the appropriate corrections could be made in the SMRs, they would be even less statistically significant than they presently are in the studies relied upon by the Plaintiff.
It is also particularly relevant in considering the Sufficiency Criterion of coherence that Nassau County, the New York county in which Maiorana resided, has had a cancer mortality rate substantially higher than that of the rest of the United States. This fact was confirmed by Shy, who testified on cross-examination regarding a study conducted by the Office of Cancer and Toxic Substance Research of the New Jersey Department of Environmental Protection which examined cancer mortality trends in the New York/New Jersey/Philadelphia region covering the years between 1950 and 1975.[71]
Between 1970 and 1975 the cancer morality rate for cancer of the large intestine  the particular form of cancer Maiorana developed was 18.1 per 100,000 persons, nationally. However, the rate for that same cancer during the same time period in Nassau County was 25.7 per 100,000. In other words, as Shy explained, the rate of cancer of the large intestine was, for some inexplicable reason, 33% higher in Nassau County than in the rest of the United States from 1970 to 1975. Shy noted further that the mortality rates for cancer of the large intestine in Nassau County were higher than the national rates throughout the entire period of the study from 1950 to 1975.
This study raises a serious question about the various carcinogenic substances to which Maiorana and all the other residents of Nassau County have been exposed over the years and which constitute confounding factors in assessing the proximate cause of Maiorana's cancer of the large intestine.
Once again, the Plaintiff has failed to satisfy a fundamental Sufficiency Criterion. The studies and surveys relied on in the Plaintiffs causation proof simply do not justify the conclusion that just because a person who has been exposed to asbestos develops colon cancer, the asbestos "clearly ... played a role" in the development of that cancer. Trial Tr. at 237. The Plaintiff's epidemiological evidence failed to satisfy the Sufficiency Criterion of coherence at trial, and the Plaintiff cannot appeal to the alleged coherence of that evidence to support the claim that the causation proof was sufficient to withstand these motions for judgment as a matter of law.

b. Clinical Evidence: The Plaintiff Offers Only A Differential Diagnosis
The Plaintiff's clinical evidence in this case consisted of ruling out confounding causes of his disease. This constituted nothing more than a differential diagnosis. "The terms `differential diagnosis' are used to describe a process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes (e.g., other than exposure to PCBs) of the injury at issue." Hines v. Consolidated Rail Corp., 926 F.2d 262, 270 n. 6 (3rd Cir.1991). This data includes the plaintiff's medical records and personal history and can be used to exclude such confounding causes as diet, physical activity, genetic tendencies and family history, obesity, and exposure to other toxins.
Here, the Plaintiff's experts testified that Maiorana's exposure to asbestos caused his colon cancer based on a lack of confounding causes. In the face of the weak epidemiological evidence regarding the coherence of asbestos exposure and colon cancer, however, such clinical evidence presented by the Plaintiff takes on critical importance, and must be examined by the Court to determine whether it constitutes a sufficient ground for the Plaintiff's proof of causation. If the treating *1049 physician has no more evidence of causation than the epidemiologist re-analyzing the data, the mere fact that the expert was the decedent's treating physician by itself is not sufficient to sustain a jury verdict in favor of the plaintiff.
In addition to the testimony of Markowitz and Shy, the Plaintiff called Doctor Nathan Rothman ("Rothman"), a specialist in internal medicine who treated Maiorana. Rothman, an expert in pulmonary medicine and lung disease, undertook a differential diagnosis of Maiorana, but because he acknowledged that he was not an expert in asbestos-related diseases, was not familiar with either the epidemiological or experimental literature on the subject, did not know the latency period for colon cancer, and had never undertaken any research regarding colon cancer or diseases of the colon, he was not qualified to draw the conclusion from his differential diagnosis that asbestos exposure was the cause of Maiorana's colon cancer. Thus it was left to Shy and Markowitz to opine that because Maiorana was 40 years old at the time of his death, had no family history of cancer, suffered from no special disease or syndrome, and did not face an abnormal risk from his diet, his exposure to asbestos must have been the cause of his colon cancer. However, their opinions failed to contribute to the sufficiency of the Plaintiff's causation proof.
Colon cancer is not rare. In 1992 alone, 111,000 new cases of colon cancer were diagnosed and 51,000 deaths from colon cancer were reported.[72] Shy acknowledged these statistics and noted that colon cancer is the second-leading cause of death from cancer in the country. Cf. Landrigan, 127 N.J. at 410, 605 A.2d 1079 ("colorectal cancer is the second most common cancer in the United States, striking 140,000 persons and causing 60,000 deaths annually"). In the face of those statistics, the question is whether Maiorana's case of colon cancer can be distinguished from other occurrences of the disease in such a way that it can be causally linked to his exposure to asbestos.
The Plaintiff suggested that the fact that Maiorana was relatively young when he died from the disease is an important point at which such a distinction can be drawn. However, on cross-examination, Markowitz did not dispute either the American Cancer Society's findings that the risk of colorectal cancer begins to increase precisely at 40 years of age or the Society's suggestion that an individual have a digital rectal examination annually after the age of 40.[73] Therefore, while it may be uncommon for a 40-year-old man to develop colon cancer, it is neither startling nor so uncommon that it constitutes a mesothelioma-like signature disease arising only when a person of that age is exposed to asbestos.
Furthermore, the Plaintiff's causation proof had to address the issue of latency. The various epidemiological studies conduct by Selikoff and relied on by Markowitz and Shy revealed a latency period for colorectal cancer of more than 20 years from the first exposure to asbestos.[74] In fact, in his 1979 study of a cohort of 12,051 insulation workers, Selikoff found that there were no occurrences of gastrointestinal cancer in persons whose first exposure to asbestos was less than 20 years earlier.[75]
In the case of Maiorana's colon cancer, only 13 years had elapsed from his first exposure to asbestos to the time he was diagnosed as having the disease. In light of this fact, the Plaintiff asserted only that the latency findings of Selikoff and others were irrelevant because Maiorana was exposed to asbestos and he did have cancer. The only studies the Plaintiff's experts referred to suggesting lower latency periods were those involving exposure to other forms of occupational carcinogens such as radiation from atomic explosions. Thus, while Maiorana's age at the time of his death raises legitimate *1050 questions about the probability of developing colon cancer and about the possible causes of colon cancer in a person his age, the likelihood that exposure to asbestos was the cause of his cancer is seriously diminished by the consistent findings of studies, otherwise relied on by the Plaintiffs, regarding the latency periods for asbestos-related cancers.
The Plaintiff's clinical evidence conclusively establish, at most, only that Maiorana had no family history of cancer, suffered from no special disease or syndrome, and did not face an abnormal risk from his diet. Given that the Plaintiff's epidemiological evidence fails to satisfy any of the Sufficiency Criteria and "the mechanisms by which chemicals induce cancer and the developmental stages from initial exposure to frank neoplasia are poorly understood,"[76] the Plaintiff's clinical evidence, which amounts to nothing more than a superficial differential diagnosis, is insufficient to support either the claim that Maiorana's exposure to asbestos was causally linked to his colon cancer or the jury's verdict for the Plaintiff.

C. The Plaintiff's Causation Proof Was Not Sufficient To Support The Jury's Verdict
Ultimately, the Plaintiff's causation evidence supports the conclusion that, "[f]or colorectal cancer, at this time there is no discernible relationship to asbestos exposure."[77] "The evidence reviewed ... indicates that the criteria for causality [between asbestos and colorectal cancer] are not met. The association is inconsistent, weak, nonspecific, and incoherent."[78] These conclusions are supported by the rather remarkable similarity in the numbers arrived at in the surveys of Gaensler and Weiss. Weiss' 1990 survey of 21 cohorts, which totalled 94,177 persons, had a summary colorectal cancer SMR of a statistically insignificant 0.97.[79] Gaensler's 1992 survey of 19 cohorts covered 93,200 persons and yielded a summary colorectal cancer SMR of an equally statistically insignificant 1.05.
The Plaintiff's experts acknowledged without refuting either the conclusions derived by the various epidemiologists used in Weiss and Gaensler's surveys or the conclusions of Weiss and Gaensler. In the face of this substantial and notably consistent body of scientific evidence, the opinions of Markowitz and Shy asserting a causal connection between asbestos and Maiorana's colon cancer were nothing more than "sheer surmise and conjecture," Samuels, 992 F.2d at 14, masquerading behind the guise of sound science.
On the present Rule 50(b) motions, the sufficiency of the Plaintiff's epidemiological evidence must be determined by analyzing that evidence on its face and without weighing the Defendants' opposing evidence against it. However, even when it is considered under this standard, the Plaintiff's epidemiological evidence fails to support the claim that exposure to asbestos causes colon cancer. The Plaintiff's epidemiological evidence does not satisfy any of the various Sufficiency Criteria. The causal relationship is not established by the statistical analyses of the two events, exposure to asbestos and developing colon cancer, and as such, the epidemiological evidence falls far short of the requisite level of sufficiency to support the jury's verdict.
The Plaintiff's causation proof failed to establish the existence of any asbestos fibers in Maiorana's cancerous tissues, as noted above. To adopt the Plaintiff's causal theory without affirmative clinical evidence regarding the presence of asbestos in Maiorana's system would permit any person suffering from any form of cancer who had been exposed to asbestos at some time in the past to sustain a cause of action based on that exposure alone. Such a result would not be consistent with the legal concept of proximate cause and the "more likely than not" test.
Additionally, when the inadequate epidemiological evidence is considered together with the Plaintiff's experimental and clinical evidence, the Plaintiff's causation proof still fails to justify the jury's verdict. The testimony *1051 of the Plaintiff's experts regarding various experimental studies evaluating the effects of asbestos on animals provided no support for the Plaintiff's theory of causation, and the Plaintiff's clinical evidence constituted nothing more than a superficial and insignificant differential diagnosis. Under the circumstances, this is but a scintilla of evidence which is too insufficient to allow the verdict to stand. It is appropriate to grant the defendants judgment as a matter of law. See Daubert, ___ U.S. at ___, 113 S.Ct. at 2798.
Therefore, despite the length and detail of the testimony given by the Plaintiff's expert witnesses and the self-assured manner in which they stated they conclusory opinions, "[t]here [was] such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture ... [that] reasonable and fair minded jurors could not arrive at a verdict against [the Defendants]." Samuels, 992 F.2d at 14 (citations and internal quotation marks omitted). The Defendants' Rule 50(b) motions are granted.

IV. Other Post-Trial Motions

In addition to their motions for judgment as a matter of law, the Defendants have moved pursuant to Rule 59 for a new trial or, in the alternative, for remittitur on the grounds that the damages awarded by the jury were excessive and the Court failed to instruct the jury adequately regarding the scope and application of § 200, N.Y.Lab.L. Tishman and Castagna also have moved for indemnification.
Although these motions are rendered moot by the entry of judgment in favor of the Defendants as a matter of law, this Court readily acknowledges the complexities and novelty surrounding the issues, methodology, and analysis employed to arrive at the conclusion that the Defendants' Rule 50(b) motions should be granted. Given the degree of uncertainty that permeates this new and ever-changing area of law, considerations of judicial economy mandate that this Court decide these other motions while they are before it at this time. Were the Second Circuit to reverse the entry of judgment as a matter of law on appeal, the Court of Appeals could use the following conclusions in shaping its order in lieu of simply reinstating the jury verdict. As should be evident, the present task of disposing of these motions on their merits is undertaken in the hope of preempting the need for this Court and the Second Circuit to visit these issues at some later date.

A. The Defendants' Motions For A New Trial On The Grounds Of The Plaintiff's Testimony, The Conduct Of The Plaintiff's Counsel, Alleged Defects In The Jury Instructions, And The Alleged Insufficiency Of The Evidence Are Denied
Rule 59(a) empowers a district court to set aside a jury verdict and order a new trial "for any reason of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. Rule 59(a)(1). The Defendants identify a variety of grounds upon which they assert they are entitled to a new trial pursuant to the rule. These include the inflammatory nature of the Plaintiff's testimony and the conduct of the Plaintiff's counsel, alleged defects in the instructions to the jury, and the alleged insufficiency of the evidence to support the jury's verdict. Each ground is considered in turn.

1. The Plaintiff's Testimony And The Closing Statement Of Plaintiff's Counsel Did Not Inflame The Passion And Sympathy Of The Jury
USMP contends that the general improper conduct of the Plaintiff's counsel created undue prejudice and played upon the passion and sympathy of the jury. While isolated and individual aspects of the testimony elicited from the Plaintiff and her sons may not rise to the level of prejudice and sympathy which would necessitate a new trial, in the Defendant's view, when the cumulative nature of the testimony is considered together with the final argument of the Plaintiff's counsel, the overall effect was to so inflame the jury that the verdict was the product of passion on both the issues of liability and damages.
*1052 The Court's charge to the jury included instructions not to base its decision on prejudice or sympathy:
You have to perform this task without letting any bias or prejudice or sympathy play any part in your deliberations. The parties and the public expect you to faithfully perform your oath, to consider the evidence carefully, impartially, follow the law as I have stated it to you, and reach a just verdict, regardless of the consequences, without fear or favor.
Trial Tr. at 2525.
Nonetheless, USMP argues that although this Court did, in fact, give a cautionary instruction to the jury following the final argument of the counsel for the plaintiff, there is no way when viewing the totality of the prejudicial argument that any instruction could have a balancing or neutralizing effect.
However, curative jury instructions should not be simply dismissed as boilerplate. See In re Joint E. & S. Dist. Asbestos Litig., 798 F.Supp. 925, 936 (E. & S.D.N.Y.1992) ("Asbestos Litig. III"), rev'd on other grounds, In re Joint E. & S. Dist. Asbestos Litig., 995 F.2d 343 (2d Cir.1993). Not every improper or poorly supported remark made in summation irreparably taints the proceedings. See Matthews v. CTI Container Transport Int'l Inc., 871 F.2d 270, 278 (2d Cir.1989). Although a trial court has the responsibility to prevent counsel from continually making improper arguments, see Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 540 (2d Cir.1992), opposing counsel's failure to object, under such circumstances, should only be due to mistake or inadvertence, neither of which USMP has alleged happened here, see Brownlee v. United Fidelity Life Ins. Co., 117 F.R.D. 383, 390 (S.D.Miss.1987), aff'd without op., 854 F.2d 1319 (5th Cir.1988).
The jury was instructed that remarks of Plaintiff's counsel were not evidence, and that they were not to be swayed by sympathy. Jurors are presumed to obey the court's instructions in this regard as in any other matter. See Nissho-Iwai Co. v. Occidental Crude Sales, Inc., 848 F.2d 613, 620 (5th Cir.1988) (lawyer's improper statements in closing did not require new trial, in part because trial court instructed jury that nothing said by lawyers was evidence and that jury should not be swayed by emotions or prejudice); Datskow v. Teledyne Continental Motors Aircraft Prods., 826 F.Supp. 677, ___, (W.D.N.Y.1993) (personal opinion statements by plaintiffs' counsel not serious enough to have prejudiced defendant).
The appropriate response to an award of damages based upon passion and sympathy is remittitur, which is considered separately below. While it is true that counsel should not choose to "inflame the jury, rather than inform it," Brownlee, 117 F.R.D. at 390, in the case at bar, the remarks of the Plaintiff's counsel and the testimony offered by the Plaintiff and the Plaintiff's witnesses do not rise to the level of impropriety such the principles of fairness and justice warrant a new trial.

2. The Jury Instruction Regarding New York Labor Law § 200 Was Not Defective
USMP alleges that it is entitled to a new trial because the Court's instructions to the jury on § 200 of New York's Labor Law did not sufficiently emphasize the negligence of the third parties as superseding intervening cause which would prevent the negligence of USMP from being a proximate cause of Maiorana's injuries. Tishman, Castagna, and Mario & DiBono, in turn, all argue that § 200 exonerates them as a matter of law or, at least, entitles them to a new trial.
Section 200 provides:
All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded and lighted as to provide reasonable and adequate protection to all such persons.
N.Y.Lab.L. § 200(1) (McKinney 1986).
The legislative history of the statute indicates that it represents a codification *1053 of the existing common law duty to protect the health and safety of employees, not to create a new obligation. See Nagel v. Metzger, 103 A.D.2d 1, 478 N.Y.S.2d 737, 479 N.Y.S.2d 161 (4th Dep't 1984); Yearke v. Zarcone, 57 A.D.2d 457, 395 N.Y.S.2d 322 (4th Dep't 1977); Schnur v. Shanray Constr. Corp., 31 A.D.2d 513, 294 N.Y.S.2d 652 (1st Dep't 1968). It imposes a non-delegable duty to take reasonable care upon the owner and contractor to avoid subjecting workers to dangerous conditions which can cause injury. See Costa v. Kjellgren Constr. Co., 18 A.D.2d 1075, 239 N.Y.S.2d 418 (2d Dep't 1963). Although the duties themselves may be delegated, the responsibility itself under the statute cannot be. See Kelly v. Diesel Constr. Div. of Carl A. Morse, Inc., 35 N.Y.2d 1, 358 N.Y.S.2d 685, 315 N.E.2d 751 (1974).
Liability attaches under New York's Labor Law when the employer receives actual or constructive notice of the dangerous condition. See Kennedy v. McKay, 86 A.D.2d 597, 446 N.Y.S.2d 124 (2d Dep't 1982); Zaulich v. Thompkins Square Holding Co., 10 A.D.2d 492, 200 N.Y.S.2d 550 (1st Dep't 1960). The defect must be apparent for a length of time sufficient to permit the defendant an opportunity to discover and remedy it. See Gordon v. American Museum of Natural History, 67 N.Y.2d 836, 501 N.Y.S.2d 646, 647, 492 N.E.2d 774, 775 (1986); Lewis v. Metropolitan Transp. Auth., 99 A.D.2d 246, 251, 472 N.Y.S.2d 368, 72 (1st Dep't), aff'd, 64 N.Y.2d 670, 485 N.Y.S.2d 252, 474 N.E.2d 612 (1984). The danger must be ascertainable through reasonable diligence by the employer. See Kennedy, 86 A.D.2d at 597, 446 N.Y.S.2d at 124; Lagzdins v. United Welfare Fund-Sec. Div. Marriott Corp., 77 A.D.2d 351, 430 N.Y.S.2d 351 (2d Dep't 1980); Abram v. Lyon Steel Rigging Corp., 111 A.D.2d 291, 489 N.Y.S.2d 281 (2d Dep't 1985).
The Court charged the jury on the issue of § 200 as follows:
[I]t is appropriate for me to take judicial notice of Section 200 of the Labor Law of the State of New York. Under that Section, the third-party defendants, the contractors, owners, agents have a legal obligation to provide reasonable and adequate protection and safety to the persons who are employed at those sites. It is appropriate, depending on your conclusion of the facts to find the site owner or a general contractor or sub-contractor liable for a condition of which they had notice, even if they did not control or supervise the construction site.
The owner, contractor and their agents are required to correct an unsafe condition which is known to them or to any of their employees. They are also responsible for failure to correct an unsafe condition which existed for so long that in the exercise of reasonable care the owner or his employer should have known of the existence and should have corrected it.
Trial Tr. at 2507-08.
The Court then instructed the jury to determine the percentage of damages which USMP had proved were proximately caused by Owens-Corning Fiberglas and any third parties. The jury found USMP 50% liable, Owens-Corning Fiberglas 2% liable, Alpine Sheet Metal 5% liable, Mario & DiBono 15% liable, and Tishman and Castagna each 14% liable on the special verdict form.
USMP also alleges that the Labor Law imposes absolute liability upon owners and general contractors for failing to provide a safe work place, essentially an argument that § 200 by definition makes the negligence of any contractor or owner a superseding cause. However, § 200 does not impose such absolute liability, although certain other portions of New York Labor Law do (such as § 241, the Scaffolding Law). Section 200 only requires that an employer not be negligent, and it imposes liability on an employer liable for such negligence if it proves to be a proximate cause of a plaintiff's harm.
Because a tort may have more than one proximate cause, the employer's negligence will rise to the level of superseding cause only where (as with any other superseding cause as discussed in more detail below) such negligence is so unforeseeable that the original tortfeasor, who has a duty to anticipate the result of his negligence, can argue the harm was impossible to foresee. Otherwise, a negligent employer and a negligent *1054 manufacturer will be concurrent tortfeasors, as the jury found them to be here.
USMP also alleges that the Court should have charged the jury with the complete sections of §§ 200, 240, and 241, N.Y.Lab.L. However, USMP, as a manufacturer, is not within the class of persons intended to be protected by this State's Labor Law. See Furia v. Mellucci, 163 A.D.2d 88, 557 N.Y.S.2d 344 (1st Dep't 1990) (employees are class of persons designed to be protected by labor law). Therefore, USMP was not entitled to jury instructions based on that law to any greater extent than was necessary for the jury to understand that an employer has a duty to use reasonable care in creating and maintaining a safe workplace as part of the supervision of its employees.
Therefore, the instruction on § 200 was a sufficient statement of the law as it related to the Defendants' liability, and the Defendants not are entitled to the relief they seek on these motions regarding this instruction.

3. The Instruction Regarding The Concept Of Superseding Cause Was Not Defective
USMP also contends that the Court failed to properly charge the jury on the law of superseding cause and intervening negligence. As a result, the Court allegedly precluded the possibility of a verdict in favor of the Defendants.
The Court charged the jury on superseding cause in the following manner:
[I]f U.S. Mineral has established that the negligence of the third parties was the sole cause of the plaintiff's injury, and that any negligence on the part of U.S. Mineral was not a substantial contributing factor in bringing about the plaintiff's injuries, then U.S. Mineral would have no liability apportioned to it for negligence.
Trial Tr. 2497. This instruction was certainly sufficient "to alert the jury to the possibility of finding that the [site-owner's] conduct interrupted the causal chain between defendants' failure to warn and plaintiffs' injuries." In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.), 971 F.2d 831, 838 (2d Cir.1992).
Under New York law, if an unforeseeable act of a third-party is a proximate cause of the tort, that act serves as a superseding cause which defeats the claim of causation and absolves the original defendant of liability for his negligence. See Cohen v. St. Regis Paper Co., 65 N.Y.2d 752, 754, 492 N.Y.S.2d 22, 24, 481 N.E.2d 562, 564 (1985); Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 669 (1980); McLaughlin v. Mine Safety Appliances Co., 11 N.Y.2d 62, 226 N.Y.S.2d 407, 181 N.E.2d 430 (1962). Whether the intervening act was foreseeable is a question of fact for the jury. See Woodling v. Garrett Corp., 813 F.2d 543, 555 (2d Cir.1987); Menna v. Johns-Manville Corp., 585 F.Supp. 1178 (D.N.J.1984), aff'd without op., 772 F.2d 895 (3d Cir.1985).
Restatement (Second) of Torts § 440 defines superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." To supersede a defendant's negligence, an intervening cause must be neither normal nor foreseeable, see Woodling, 813 F.2d at 555; Lynch v. Bay Ridge Obstetrical & Gynecological Assocs., P.C., 72 N.Y.2d 632, 636, 536 N.Y.S.2d 11, 13, 532 N.E.2d 1239, 1241 (1988), which breaks the usual causal nexus of proximate cause because it is extraordinary under the circumstances, see Derdiarian, 51 N.Y.2d 308, 315, 434 N.Y.S.2d at 169.
An intermediary's failure to warn breaks the causal circumstances only if it proves to be so extraordinary and unforeseeable under the circumstances that "only one legal conclusion may be drawn." Billsborrow v. Dow Chem., U.S.A., 177 A.D.2d 7, 579 N.Y.S.2d 728, 733 (2d Dep't 1992) (because manufacturer's sales representative could have posted notices in plant, issue of intervening cause was question of fact despite extensive warnings on manufacturer's original chemical containers).
In certain circumstances, if the chain of distribution is such that the duty to warn ultimate users logically falls upon an intermediary *1055 in the chain, instead of on the manufacturer, the "sophisticated intermediary" doctrine may completely protect a manufacturer from liability under a theory of negligence. See, e.g., Wolfgruber v. Upjohn Co., 72 A.D.2d 59, 62-63, 423 N.Y.S.2d 95, 97-98 (1979) (prescribing physician should warn patient of product's dangers), aff'd, 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980); Rivers v. AT & T Technologies, Inc., 147 Misc.2d 366, 372, 554 N.Y.S.2d 401, 405 (1990) (bulk chemical manufacturer relieved of liability where ultimate user was "too remote in the chain of distribution" and manufacturer "provided extensive warnings to its immediate distributees"); Goodbar v. Whitehead Bros., 591 F.Supp. 552 (W.D.Va.1984) (silica sand suppliers had no possibility of control over foundry working conditions nor over warnings where unpackaged sand was shipped in on railroad cars; moreover "a plethora of material ... clearly shows the foundry is a knowledgeable employer within a knowledgeable industry"), aff'd sub nom. Beale v. Hardy, 769 F.2d 213 (4th Cir.1985); see generally Brooklyn Navy Yard, 971 F.2d at 838; Restatement (Second) of Torts § 388.
The latent quality of the defects in asbestos products makes the issues of the sophisticated intermediary and intervening negligence questions of fact for the jury to decide, as it did here. See Menna v. Johns-Manville Corp., 585 F.Supp. 1178, 1186 (D.N.J.1984); Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357, 383 (E.D.Pa. 1982), aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir. 1985). The jury found that the manufacturer's reliance upon the contractor's duty to warn did not exonerate the manufacturer from liability. Both could be  and the jury found that both were  negligent. This is in line with the results reached in other asbestos cases. "Given that the record supports neither a finding that defendants actually relied on the Navy to warn its workers, nor a finding that any such reliance would have been justifiable," there was no need to charge at length about a sophisticated intermediate, for "[i]f the jury had concluded that the Navy was fully responsible for plaintiffs' injuries, it would have known from the district court's charge to absolve the defendants." Brooklyn Navy Yard, 971 F.2d at 838.
The jury did not find that negligence of the third parties was a superseding cause of the plaintiff's harm, although it had before it evidence, taken from the documents produced by USMP, that the third parties had "pervasive knowledge of the dangers of asbestos," as USMP argues. This Court cannot conclude that the jury's refusal to find the negligence of the contractors and subcontractors makes the verdict contrary to the weight of law and evidence. Accordingly, USMP's request for a new trial based upon the jury's refusal to find the negligence of the third-parties a superseding cause of the decedent's injuries must be denied.

4. The Instruction Regarding The Status of The Port Authority Was Not Defective
Tishman alleges that neither the Port Authority nor its agents are subject to the Labor Law of this State. According to Tishman, since nothing in the bi-state compact creating it explicitly subjects it to New York's labor laws, and since this interstate compact may not be modified without the express consent of all the parties to the compact, neither it nor its agents is subject to the duty to be not negligent in providing a reasonably safe place to work.
Even if the Port Authority itself were not subject to New York laws, this exemption would extend only to its "direct employee," not to its lessees or contractors.
The distinction between the internal operations and conduct affecting external relations of the [Port] Authority is crucial in charting the areas permitting unilateral and requiring bilateral State action. New York and New Jersey have each undoubted power to regulate the external conduct of the Authority, and it may hardly be gainsaid that the Authority, albeit bistate, is subject to New York's laws involving health and safety, insofar as its activities may externally affect the public.
Agesen v. Catherwood, 26 N.Y.2d 521, 525, 311 N.Y.S.2d 886, 890 (1970) (explicitly holding only "direct" employees, not employees of *1056 contractors, subject to regulations designed solely for Port Authority). When cleaning contractors hired by a lessee of the Port Authority tried to argue that New York Labor Law did not apply to them, the Court held that "statutes establishing the Port Authority's control of its air terminals ... contain nothing indicating an intent to deprive [the plaintiff] of his rights ... asserted under the N.Y. Labor Law," and that "the Port Authority, in its brief submitted amicus curiae ... supports this conclusion." Kozman v. Trans World Airlines, Inc., 236 F.2d 527, 533 (2d Cir.1956). Documents submitted into evidence demonstrate that at the time of the construction of the WTC the Port Authority believed it was required to conform the worksite to New York's Labor Law, and nothing submitted by Tishman contradicts this. Therefore, Tishman's analysis of the status of the Port Authority fails to support Tishman's claim that the instructions to the jury were defective and a new trial is warranted.

5. The Evidence Was Sufficient To Support The Jury Finding Of Constructive Notice
Castagna, Tishman, and Mario & DiBono have not identified any flaws in the Court's instructions to the jury. Instead, they allege that as a matter of law the evidence is insufficient to justify the jury's percentage assignment of liability to each of them.[80]
Both Castagna and Tishman claimed at trial that USMP never advised either of them about any information which USMP had received concerning the dangers of asbestos, and that reasonable diligence on their part would not have been able to uncover such. Without such notice, they argue, the protections of § 200 do not apply to any negligence on their part in the handling of USMP's asbestos-containing products. However, there is sufficient evidence on the trial record to support the jury's finding of notice to and fault on the part of the contractors and subcontractors.
The evidence submitted at trial demonstrates that both worksites were full of asbestos-containing dust. The dust itself put the contractors on notice that their employees would be at risk if there were any known harms associated with breathing the dust. See Brooklyn Navy Yard, 971 F.2d at 839. The testimony of one of Maiorana's co-workers at the WTC indicated that the sprayed asbestos material would cause a "fog" at the site and that the dust created by the spraying would not always be cleaned up by the time the sheet-metal workers were working in the area. Another co-worker testified that the fireproofing material left after spraying at Meadowbrook was not cleaned or swept up to the point where he was forced to complain to Castagna, the general contractor at that site.
Tishman and Castagna allege, however, that they never received constructive knowledge that the asbestos dust was dangerous, or caused cancer. Constructive knowledge is imputed where an employer taking reasonable care would have learned such a fact. See Gallose v. Long Island R. Co., 878 F.2d 80, 84-85 (2d Cir.1989). USMP introduced, in the course of trial, several exhibits, which a rational jury could conclude demonstrated actual or constructive knowledge on the part of the contractors of hazards associated with asbestos dust, and the jury, through its answers to interrogatories on the special verdict form, specifically found that the third-party contractors did not take due care.
The evidence at the trial of this lack of due care was more than de minimis. Beginning in 1962, USMP placed a caution label on its products which warned that the "inhalation of asbestos dust over long periods may be harmful," and recommended protective devices for employees. USMP's evidence also included the Recommended Code of Practices for Application of Sprayed Fireproofing Materials and the New York Department of Labor Code Rule 12-27(C), which adopted a threshold level for asbestos on construction sites in New York, and the Occupational Safety and Health Administration's *1057 ("OSHA") enactment of Occupational Safety and Health Standards for asbestos.
On July 29, 1969, representative of the Port Authority, Tishman, and Mario & DiBono attended a pre-construction safety meeting, and Tishman wrote Mario & DiBono on September 12, 1969, requesting that the subcontractor submit a safety program to cover the items discussed at the meeting. Representatives of Tishman and the Port Authority met with Dr. Selikoff of the Mount Sinai School of Medicine on September 11, 1969, which was followed by an inspection by scientists from the Environmental Sciences Laboratory associated with Mount Sinai. USMP submitted evidence that these meetings resulted in recommendations for protective masks, immediate clean-up of the dust from the spraying, and enclosing of the core area with canvas, among other suggestions. Representatives of Tishman also attended the Sprayed Asbestos Meetings conducted by Dr. Selikoff on December 5, 1969 and again on January 10, 1970.
USMP also put into evidence newspaper articles and media reports, which may have served to provide constructive notice. See Barnett v. City of Yonkers, 731 F.Supp. 594 (S.D.N.Y.1990). USMP produced several examples of media reporting on the dangers of asbestos, such as a New York Times article, dated March 25, 1970, concerning New York congressman Richard Ottinger's calls for controls on the use of asbestos spray fireproofing.
Tishman maintains that even if this evidence implies that it had constructive or actual notice of the general hazards of asbestos, this does not mean that knowledge of asbestos' cancer-causing properties should be imputed to it. However, this defense, which is identical to the defense put on by USMP itself at trial, is an issue of fact to be decided by the jury. When Tishman knew or should have known of all the dangers of asbestos, including its cancer-causing properties, in the exercise of reasonable diligence is a question of fact. Under the circumstances, this fact had been decided against Tishman, and the Court declines to disturb this finding of the jury.
USMP submitted evidence that Tishman was negligent in the form of complaints by Mario & DiBono about Tishman's failure to supply containers to carry away the cleaned-up dust and complaints that Tishman's representative was repeatedly absent from safety meetings. From this evidence, a rational jury could have concluded that Tishman had notice of the hazards of the asbestos dust and was negligent in maintaining a safe worksite.
A reasonable jury could find from this record that Castagna also had constructive notice from the same cautions, industry manuals, OSHA standards, and media reports available to Tishman. Although the safety meetings with medical faculty from Mount Sinai did not occur at Meadowbrook, there was still sufficient evidence to justify a reasonable jury finding on this issue. USMP also submitted evidence from which the jury could infer that Castagna was negligent; among other items, USMP introduced into evidence a letter from HRH Construction ("HRH") written to the Nassau County Department of Public Works on October 2, 1969, in which HRH complained that the general contractor was not cleaning up the dust from the asbestos spraying.
Although Castagna dismisses the examples of constructive notice as "these obscure references" which are "wholly insufficient as a matter of law to provide the requisite notice under Section 200," they are sufficient to demonstrate the possibility of imputing constructive knowledge of the dangers of asbestos to an employer anxious to take reasonable care in supervising his employees. In short, § 200 does not justify the grant of a new trial to the contractors based upon a lack of notice or such a complete absence of evidence of their negligence that the verdict must be set aside.
USMP also produced more than a scintilla of evidence to show that Mario & DiBono knew asbestos was dangerous and that the subcontractor may not have abided by all the appropriate regulations. The same factual evidence which demonstrated constructive notice on the part of Tishman and Castagna was introduced against Mario & DiBono. USMP also demonstrated various examples of warnings it gave in connection with the *1058 insulation  e.g., that it used warning labels on its products from 1962 on, and that its 1968 Sales and Application Manual required employees to be equipped with individual respirators.
On the issue of Mario & DiBono's negligence, USMP submitted evidence that, even though Mario & DiBono was contractually obligated to clean up the asbestos-containing debris remaining after its work, conditions at both sites were such that complaints were made against Mario & DiBono. USMP introduced testimony to show that certain employees complained to Castagna, the general contractor at Meadowbrook. USMP introduced documents to show that Tishman cited Mario & DiBono for allowing the insulation to blow into surrounding areas, and that at one point Tishman directed Mario & DiBono to stop spraying until it installed tarpaulins for protection from the dust.
Once such evidence is introduced, the question of Mario & DiBono's negligence become questions of fact which can only be appropriately resolved by a jury. There is no evidence on the record of the present motions that is sufficient to disturb the jury's finding of negligence on the part of Mario & DiBono.

6. The Defendants Are Not Entitled To A New Trial On Any Of The Aforementioned Grounds
While each of the various general grounds identified by the Defendants have been recognized as reasons on which United States courts have set aside jury verdicts and granted Rule 59 motions for new trials, the Defendants have failed to establish on the record of this trial that they are actually entitled to a new trial as a result of the defects and insufficiencies they specifically allege.

B. The Defendants' Motion For Remittitur Or, In The Alternate, A New Trial On The Ground Of The Excessiveness Of The Damages Awarded Is Granted
Remittitur is employed when a damage award "is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir.1984). An excessive award may "shock the judicial conscience," see Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1327 (2d Cir.1990); Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990); O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir.1988); Martell v. Boardwalk Enter., Inc., 748 F.2d 740, 752 (2d Cir.1984); Malandris v. Merrill Lynch Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir.1981) (en banc), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir.1978); United States ex rel. Larkins v. Oswald, 510 F.2d 583, 589 (2d Cir.1975).
A New York district court sitting in diversity may look to other jury awards condoned or remitted by the courts of New York state, Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 750 (2d Cir.1984); see also Adrat v. Mt. Sinai Hospital, 110 A.D.2d 599, 488 N.Y.S.2d 613 (1st Dep't 1985); Heyer v. New York, 109 A.D.2d 662, 487 N.Y.S.2d 537 (1st Dep't 1985); Thornton v. Montefiore Hosp., 99 A.D.2d 1024, 473 N.Y.S.2d 758 (1st Dep't 1984); Griffith v. City of New York, 99 A.D.2d 692, 471 N.Y.S.2d 537 (1st Dep't 1984).
USMP contends that the damages awarded by the jury to the Plaintiff were excessive as the result of passion and prejudice and so great as to shock the judicial conscience. In support of this claim, USMP cites the decisions of the Honorable Helen Freedman, the New York State Justice assigned to handled New York's consolidated state-law asbestos cases, in Didner v. Keene Corp. (Sup.Ct., IA Part 30), reported in N.Y.L.J., Jan. 4, 1991, at 21. Justice Freedman's decisions on damages have been followed by other district courts in deciding the appropriateness of asbestos injury awards. See Asbestos Litig. III, 798 F.Supp. at 938.
In Didner, the decedent was an electrician who suffered from mesothelioma for a little over two years before dying in 1986. The total jury verdict of approximately $6,000,000 included an award of $3,250,000 for the decedent's pain and suffering and $1,500,000 for the plaintiff widow's loss of consortium.
*1059 Justice Freedman, following Jones v. Simeone, 112 A.D.2d 772, 492 N.Y.S.2d 270 (4th Dep't 1985), assessed the award for pain and suffering within the framework of four factors: duration, severity, degree of consciousness, and apprehension of impending death. See Juiditta v. Bethlehem Steel Corp., 75 A.D.2d 126, 428 N.Y.S.2d 535 (4th Dep't 1980); Tenczar v. Milligan, 47 A.D.2d 773, 365 N.Y.S.2d 272 (3d Dep't 1975). Although acknowledging that the decedent's pain and suffering was substantial, the court noted that prior awards of such size had involved cases where the plaintiff or decedent had been incapacitated for decades or more. The court found an award of $2,300,000 to be more appropriate, and reduced the award accordingly. Didner, supra at 21.
The court also found excessive the award of $1,500,000 for loss of consortium. Evaluating the evidence of the loss of physical services, yard care, child care, and intangible items such as spousal love and affection, see Christman v. Bailey, 38 A.D.2d 773, 327 N.Y.S.2d 966 (3d Dep't 1972) and Millington v. Southeastern Elevator Co., 22 N.Y.2d 498, 293 N.Y.S.2d 305, 309, 239 N.E.2d 897, 901 (1968), the court concluded the award was unjustified. Again, although the plaintiff submitted evidence that the marriage had been very close and that the damage to the marriage by the decedent's debilitating disease had been extensive, the court still found the amount excessive. Stating that the assessment of damages for such a claim must be based upon "the real injury done to the marital relationship," the court reduced the award to $500,000. Cf. Asbestos Litig. III, 798 F.Supp. at 938 (loss of consortium awards for $400,000 and $365,000 in two asbestos cases).
Based on this case, USMP asserts that both awards should be set aside. That is clearly too drastic in light of Justice Freedman's analysis: The noneconomic awards in Didner were reduced, not set aside. Pursuant to the decision in Didner, however, it would be appropriate to reduce the awards in order to bring the jury's award into line with standards prevailing for asbestos actions in the State of New York.
A federal court faced with a question of state law must follow the decisions of the state court of last resort, or, if the law is unsettled, do its best to guess how that court would decide the issue. See De Weerth v. Baldinger, 836 F.2d 103, 108 (2d Cir.1987), cert. denied, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988). Where the highest court has not spoken, the best indicators of how it would decide often are the decisions of lower state courts. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782-83, 18 L.Ed.2d 886 (1967). While a federal court is not bound by lower state court decisions, they do have great weight in informing the court's prediction on how the highest court of the state would resolve the question. See In re Brooklyn Navy Yard, 772 F.Supp. 1380, 1390 (E. & S.D.N.Y.1991). However, when ordering remittitur, the court should reduce the award by an amount which least intrudes upon the province of the jury, i.e., only to the maximum that would be upheld by the trial court as not excessive, Earl, 917 F.2d at 1328, 1330.
The Court of Appeals has already deferred to the anticipated opinion of the Appellate Division, First Department in Didner v. Keene Corp., 188 A.D.2d 15, 593 N.Y.S.2d 238 (1st Dep't), appeal granted, 81 N.Y.2d 707, 597 N.Y.S.2d 938, 613 N.E.2d 970 (1993), on the issue of whether settlements should be aggregated for the purposes of N.Y.G.O.L. 15-108 set-offs, and remanded the issue to the district court for reconsideration in light of First Department's anticipated decision in that case. See Brooklyn Navy Yard, 971 F.2d at 852. Under the circumstances, it would be appropriate for this Court to follow the logic of Justice Freedman in Didner, for her reduction in the awards was affirmed without discussion in the decision anticipated by the Court of Appeals for the Second Circuit. See Didner v. Keene, 188 A.D.2d at 15, 593 N.Y.S.2d at 238 ("The underlying action ... resulted in a jury verdict of almost $6,000,000 that was ultimately reduced by the trial court.") Accordingly, following Didner, the award for pain and suffering should be reduced from $2,000,000 to $1,300,000, and the award for loss of consortium *1060 should be reduced from $1,000,000 to $500,000.
USMP also asserts that the jury's award of $300,000 to the decedent's two children for the present value of the loss of services and parental care and guidance was excessive. The jury awarded $100,000 for the loss of services and parental care and guidance from the time of the decedents' death to the present, and $300,000 as the present value of the loss of services and parental care and guidance in the future. At the time of trial, the decedent's sons were 20 and 24 years old.
USMP contends that a comparison of these two awards shows that the award for the future loss of services and parental care is excessive, especially since the evidence submitted to the jury did not indicate that the decedent would have continued to support his children after their majority.
However, that issue was put to the jury and considered by it. The jury charge specifically included the instruction that the jury was to consider the fact that Maiorana had no legal obligation to support his children, and that it was up to them to decide, based on the evidence before them, whether he would have done so. USMP has put before this Court no case where such an award for the loss of future parental care and guidance was reduced for this reason. Accordingly, the Court declines to reduce it now.
USMP contests no other portion of the damages. Although the third-party Defendants have moved for remittitur as one item in their omnibus motions, none of them have argued for any specific reductions in the itemized damages found by the jury. Therefore, the motion for remittitur is granted, and the awards are reduced accordingly.

C. The Motions of Tishman and Castagna for Indemnification Is Denied
At common law, a party who "had committed no wrong, but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party," was entitled to common law indemnification. D'Ambrosio v. City of New York, 55 N.Y.2d 454, 461, 450 N.Y.S.2d 149, 435 N.E.2d 366 (1982). "[W]here one is held liable solely on account of the negligence of another, indemnification principles apply to shift the entire liability to the one who was negligent." Id. at 462, 450 N.Y.S.2d 149, 435 N.E.2d 366; see also Guzman v. Haven Plaza Hous. Dev. Fund Co., 69 N.Y.2d 559, 516 N.Y.S.2d 451, 509 N.E.2d 51 (1987); Rogers v. Dorchester Assocs., 32 N.Y.2d 553, 347 N.Y.S.2d 22, 300 N.E.2d 403 (1973).
Both Tishman and Castagna have moved for common-law indemnification against Mario & DiBono pursuant to Dole v. Dow Chem. Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972) (shifting burden of accident to party directly responsible for danger).
Although Mario & DiBono was contractually responsible for applying and cleaning up the Cafco D spray on the interior of the WTC and at Meadowbrook Hospital, it was undisputed that both general contractors exercised control over the workplace.
The statutes mandate first instance liability on the owner or general contractor so that, with respect to the injured workman, the owner or general contractor cannot escape lability for accidents caused by his subcontractor.... All that would be changed by applying the Dole v. Dow doctrine uniformly is that, under familiar common-law principles, full indemnification can be recovered from the contractor who caused the accident (the active tort feasor) and where the cause is shared contribution under the Dole-Dow doctrine.
Kelly, 35 N.Y.2d at 6, 358 N.Y.S.2d at 689, 315 N.E.2d at 755; see also Allen v. Cloutier Constr. Corp., 44 N.Y.2d 290, 405 N.Y.S.2d 630, 376 N.E.2d 1276 (1978) (contractual claim for indemnity).
Indemnity was considered more palatable to courts operating in the common law tradition than contribution, presumably as an extension of the theory that the courts would not sustain a claim by a defendant upon his own wrong. See Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718 (2d Cir.1978) (Friendly, J.). Indemnity under tort law could be founded upon a contract or a relationship which the courts interpreted to "imply" a contract, or "merely upon a difference *1061 between the kinds of negligence of the two tortfeasors; as for instance, if that of the indemnitor is only `passive,' while that of the indemnitor is `active.'" Slattery v. Marra Bros., Inc., 186 F.2d 134, 138 (2d Cir.), cert. denied, 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951). "Where both are liable to the same person for a single joint wrong, and contribution, stricti juris, is impossible, the temptation is strong if the faults differ greatly in gravity, to throw the whole loss upon the more guilty of the two." Zapico, 579 F.2d at 718 (quoting Judge Learned Hand). Where the cause of the accident is shared, and contribution is permissible by law, the appropriate result is contribution and not indemnity. See Kelly, 358 N.Y.S.2d at 689, 315 N.E.2d at 755.
In the case at bar, the comparative fault of all three contractors has already been determined by the jury, a finding which eliminates this distinction and bars the two contractors' claims for indemnity. Indemnity consists of a shifting of the entire cost, and is appropriate only when the party seeking indemnification is wholly not at fault.
In the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, not the trial court, and a jury's finding of facts should be accorded great deference by a court. See Birnbaum v. All-State Vehicle, Inc., 139 A.D.2d 553, 527 N.Y.S.2d 52 (2d Dep't 1988). The court must ensure that its duty to oversee the proper administration of justice does not lead it to overstep its proper authority and unnecessarily interfere with this fact-finding function. See Zolli v. DuBois, 88 A.D.2d 951, 451 N.Y.S.2d 189 (2d Dep't 1982); Durante v. Frishling, 81 A.D.2d 631, 438 N.Y.S.2d 128 (2d Dep't 1981); Facteau v. Wenz, 78 A.D.2d 931, 433 N.Y.S.2d 238 (3d Dep't 1980); Ellis v. Hoelzel, 57 A.D.2d 968, 394 N.Y.S.2d 91 (3d Dep't 1977).
Here, there was sufficient proof to support a rational jury's findings that both Tishman and Castagna actively participated in the construction on the worksites and controlled Maiorana's employer, Alpine. Both contractors had on-site inspectors and employees, and they directly coordinated the trade, had direct involvement in the order and timing of the subcontractors' work, and shared contractual obligations in the clean-up of the sites. The jury was charged on the law of negligence, and the jury found both Tishman and Castagna negligent and assigned the proportion of total liability for their negligence to each.
The jury's findings on the issue of liability were reasonable in light of the evidence before it, and the present motions of Tishman and Castagna for indemnification are justified neither by law or fact. Therefore, the motions are denied.

Conclusion
The Defendants' Rule 50(b) motions for judgment as a matter of law are granted. In the event this decision is appealed and the appeal is successful, the motion for remittitur is granted in the amounts stated above, and the motions of Tishman and Castagna for indemnification are denied. The verdict awards for pain and suffering and for loss of consortium will be set aside and a new trial ordered unless the plaintiff agrees to accept damages in the amount of $1,300,000 for pain and suffering and $500,000 for loss of consortium.
It is so ordered.
NOTES
[1] Effective December 1, 1991, Rule 50's use of the terms "judgment notwithstanding the verdict" and "directed verdict" were abandoned, and "judgment as a matter of law" now encompasses both pre-verdict and post-verdict motions. The standard for granting the motion has not changed, however. See Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir.1993).
[2] Tishman, Castagna, and Mario DiBono are all currently third-party defendants. Motions prior to trial consolidated the action and converted all fourth-, fifth-, and sixth-party defendants into third-party defendants. All but USMP of the direct defendants settled before the verdict.
[3] See Guido Calabresi, Concerning Cause and the Law Of Torts, 43 U.Chi.L.Rev. 69, 71 (1975).
[4] A cause is actually a set of conditions, some of which may be necessary and all of which when taken together are sufficient to give rise to a certain effect.
[5] "The causal relation is essentially a relation between concrete individual events; and it is only so far as these events exhibit likeness to others, and can therefore be grouped with them into kinds, that it is possible to pass from individual causal facts to causal laws." C.J. Ducasse, On the Nature and the Observability of the Causal Relation, in Causation and Conditionals 114, 118-19 (Ernest Sosa ed., 1975).
[6] See H.L.A, Hart & Tony Honore, Causation in the Law 84-94 (2d ed. 1985) (discussing the differences between the concepts of cause-in-fact and proximate cause).
[7] Of course, if quantum mechanics proves to be true, no law of nature could be formulated in terms of universal connections; all laws would necessarily employ the concept of probabilistic causality. See Ernest Nagel, The Structure of Science: Problems in the Logic of Scientific Explanation 293-316 (2d ed. 1979); John A. Wheeler, Law Without Law, in Quantum Theory and Measurement 183 passim (John A. Wheeler & Wojciech H. Zurek eds., 1983).

In the face of both quantum theory and the practical need to test and rely on hypotheses regarding complex physical mechanisms about which there is limited knowledge, a great deal of discussion has taken place regarding the viability and coherence of not only probabilistic laws but also of a thorough-going probabilistic science. See D.M. Armstrong, What Is a Law of Nature? 128-36 (1983); Nancy Cartwright, How the Laws of Physics Lie (1983); Carl G. Hempel, Aspects of Scientific Explanation and Other Essays in the Philosophy of Science 376-412 (1965); Isaac Levi, Gambling With Truth: An Essay on Induction and the Aims of Science 190-204 (1967); J.L. Mackie, The Cement of the Universe: A Study of Causation 231-47 (1980); Karl R. Popper, The Logic of Scientific Discovery 146-214 (rev. ed. 1968); Wesley C. Salmon, Scientific Explanation and the Causal Structure of the World 184-205 (1984); Patrick Suppes, A Probabilistic Theory of Causality (1970); John Watkins, Science and Scepticism 225-46 (1984).
[8] See, e.g., Suppes, supra note 6, at 21-47 (distinguishing and discussing direct, indirect, supplementary, sufficient, necessary, negative, and spurious causes).
[9] Troyen A. Brennan, Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation, 73 Cornell L.Rev. 469, 474-75 (1988).
[10] For a discussion of the four methods employed by scientists to identify carcinogens, see Brennan, supra note 9, at 502-09.
[11] However, awards inconsistent with scientific evidence have been upheld by the courts, provided admissible evidence may establish the legal requirement of proximate cause according to facts found by a jury. Typical examples are cases where the plaintiffs have alleged that traumatic injury or exposure to an immediately irritating or harmful substances was the cause of their cancer, despite a lack of scientific evidence that such traumas actually cause cancer. See Bert Black and David E. Lilienfeld, Epidemiological Proof in Toxic Tort Litigation, 52 Fordham L.Rev. 732, 739-744 (1984). This potential conflict between legal and scientific standards of proof has become and continues to be a source of considerable controversy in the area of toxic and carcinogenic torts.
[12] Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as; an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
[13] Rule 703 states: "The facts or date in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts of data need not be admissible in evidence." Fed. R.Evid.Rule 703. This rule has been referred to as the "expert testimony exception to the hearsay rule." Ambrosini v. Labarraque, 966 F.2d 1464, 1466 (D.C.Cir.1992). For an analysis of the respective roles of Rules 702 and 703, see Edward J. Imwinkelried, The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony, 67 N.C.L.Rev. 1 passim (1988).
[14] Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."
[15] For a useful discussion of the evolution of epidemiological research regarding Bendectin and the limitations of epidemiological studies and statistical analyses generally, see Joseph Sanders, The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts, 43 Hastings L.J. 301, 339-48 (1992).
[16] SMR stands for the standardized mortality ratio, which was defined and discussed in Section II.B supra.
[17] See A. Bradford Hill, The Environment and Disease: Association or Causation, 58 Proc.Royal Soc'y Med. 295, 295-300 (1965).
[18] "Consistency requires that the association be repeatedly observed by multiple investigators, in different locations and situations at different times, using different methods of study." William Weiss, Asbestos and Colorectal Cancer, 99 Gastroenterology 876, 881 (1990) (quoting U.S. Dep't Health & Human Serv., The Health Consequences of Smoking, A Report of the Surgeon General (1982)).
[19] See id. at 881 (discussing the criteria suggested by Hill and those established by an advisory committee to the Surgeon General of the U.S. Public Health Service in 1964: (1) consistency of association; (2) strength of the association; (3) specificity of the association; (4) temporal relationship of the association; (5) coherence of the association; and (6) decrease in risk of disease after decrease or cessation of exposure to the agent).
[20] The Plaintiff read the 1976 deposition testimony of Smith into the record. Smith's testimony focused on the general causal linkage between asbestos and cancer and the historical development of the understanding of the carcinogenic dangers of the substance. His own research and expertise was in the area of pulmonary disabilities caused by asbestos. Aside from supporting the general proposition that asbestos causes lung cancer, asbestosis, and mesothelioma, Smith's testimony offered no support for Plaintiff's specific causation contention that exposure to asbestos causes colon cancer.
[21] See A. Ehrlich et al., Asbestos Bodies in Carcinoma of Colon in an Insulation Worker With Asbestosis, 254 J.Am.Med.Ass'n 2932 (1985).
[22] Markowitz also testified that the pathology reports were devoid of any mention of asbestos fibers in Maiorana's lungs.
[23] Stephen Zoloth & David Michaels, Asbestos Disease in Sheet Metal Workers: The Results of a Proportional Mortality Analysis, 7 Am.J.Indus.Med. 315 (1985).
[24] See David Michaels & Stephen Zoloth, Asbestos Disease in Sheet Metal Workers: Proportional Mortality Update, 13 Am.J.Indus.Med. 731, 732 (1988).
[25] See J.C. McDonald et al., Dust Exposure and Mortality in Chrysotile Mining, 1910-75, 37 Brit.J.Indus.Med. 11 (1980).
[26] See Alfred I. Neugut et al., Association of Asbestos Exposure With Colorectal Adenomatous Polyps and Cancer, 83 J.Nat'l Cancer Inst. 1827 (1991).
[27] Id. at 1828 (emphasis added).
[28] Shy testified similarly that Neugut's conclusion regarding the association between asbestos and polyps "was of borderline significance." Trial Tr. at 1544.
[29] See Irving J. Selikoff, et al., Mortality Experience of Insulation Workers in the United States and Canada, 1943-1976, 330 Annals N.Y.Acad.Sci. 91, 108 (1979). This SMR was significantly lower from the 3.08 SMR for colorectal and stomach cancer Selikoff found in insulation workers in a 1965 study he undertook with Hammond and Churg. See E.C. Hammond et al., Neoplasia Among Insulation Workers in the United States With Special Reference to Intra-Abdominal Neoplasia, 132 Annals N.Y.Acad.Sci. 519, 521 (1965). The substantially lower SMRs for colorectal cancer in the subsequent studies suggest that there was a disproportionate incidence of stomach cancer in the cohort of 1522 workers.
[30] See Herbert Seidman, et al., Mortality Experience of Amosite Asbestos Factory Workers: Dose-Response Relationships 5 to 40 Years After Onset of Short-Term Work Exposure, 10 Am.J.Indus.Med. 479 (1986).
[31] See id. at 483.
[32] See Irving J. Selikoff & Herbert Seidman, Asbestos-Associated Deaths Among Insulation Workers in the United States and Canada, 1967-1987, 643 Annals N.Y.Acad.Sci. 1, 8 (1991).

Selikoff and Seidman derive the SMRs in these studies from so-called "best evidence." "Best evidence" refers to data taken from a number of sources other than death certificates to calculate SMRs. Morgan et al. reject the use of "best evidence" by Selikoff and others on the ground that it introduces an erroneous bias into the calculation of SMRs and results in their being unjustifiably inflated. See Robert W. Morgan et al., Asbestos and Gastrointestinal Cancer: A Review of the Literature, 143 W.J.Med. 60, 63-64 (1985).
[33] See Bjorn Hilt et al., Asbestos Exposure, Smoking Habits, and Cancer Incidence Among Production and Maintenance Workers in an Electrochemical Plant, 8 Am.J.Indus.Med. 565, 571 (1985).
[34] See id.
[35] See id. at 573.
[36] Of course, the conclusions of Hilt's study regarding the SMR of colorectal cancer can be seriously questioned without undertaking the proposed comparative analysis simply by noting the limited cohort of 287, the smallest cohort of all of the studies discussed at trial. The corresponding power of the study is, as would be expected, a mere 0.08.
[37] See E.D. Acheson et al., Cancer in a Factory Using Amosite Asbestos, 13 Int'l J. Epidemiology 3 (1984) (colorectal cancer SMR 1.32); B.K. Armstrong et al., Mortality in Miners and Millers of Crocidolite in Western Australia, 45 Brit.J.Indus.Med. 5 (1988) (SMR 1.14); P.E. Enterline et al., Asbestos and Cancer: A Cohort Followed Up to Death, 44 Brit.J.Indus.Med. 396 (1987) (SMR 1.16); Thomas F. Mancuso & Elizabeth J. Coulter, Methodology in Industrial Health Studies, 6 Archives of Envtl.Health 210 (1963) (SMR 1.47); Riccaro Putoni et al., Mortality Among Shipyard Workers in Genoa, Italy, 330 Annals N.Y.Acad.Sci. 353 (1979) (SMR 1.39).
[38] See Johannes Clemmesen & S. Hjalgrim-Jensen, Cancer Incidence Among 5686 Asbestos-Cement Workers Followed From 1943 Through 1976, 5 Ecotoxicology & Envtl.Safety 15 (1980) (SMR 0.86); M.J. Gardner & C.A. Powell, Mortality of Asbestos Cement Workers Using Almost Exclusively Chrysotile Fibre, 36 J.Soc'y Occup.Med. 124 (1986) (SMR 0.71); J.T. Hodgson & R.D. Jones, Mortality of Asbestos Workers in England and Wales 1971-81, 43 Brit.J.Indus.Med. 158 (1986) (SMR 0.81); Janet M. Hughes, Mortality of Workers Employed in Two Asbestos Cement Manufacturing Plants, 44 Brit.J.Indus.Med. 161 (1987) (SMR 0.90); McDonald, supra note 25 (SMR 0.78); C.-G. Ohlson & C. Hogstedt, Lung Cancer Among Asbestos Cement Workers. A Swedish Cohort Study and a Review, 42 Brit.J.Indus.Med. 397 (1985) (SMR 0.59); C.-G. Ohlson, Mortality Among Asbestos-Exposed Workers in a Railroad Workshop, 10 Scand.J.Envtl.Health 283 (1984) (SMR 0.71); J. Peto et al., Relationship of Mortality to Measures of Environmental Asbestos Pollution in an Asbestos Textile Factory, 29 Annals Occup.Hygiene 305 (1985) (SMR 0.80); Vilhjalmur Rafnsson et al. Mortality and Cancer Incidence Among Marine Engineers and Machinists in Iceland, 14 Scand.J.Work Envtl.Health 197 (1988) (SMR 0.88); S. Tola, et al., Incidence of Cancer Among Welders, Platers, Machinists, and Pipe Fitters in Shipyards and Machine Shops, 45 Brit.J.Indus.Med. 209 (1988) (SMR 0.80).
[39] See E.D. Acheson et al., Mortality of Two Groups of Women Who Manufactured Gas Masks From Chrysotile and Crocidolite Asbestos: A 40-Year Follow-Up, 39 Brit.J.Indus.Med. 344 (1982).
[40] Gaensler arrived at this conclusion and based it on his survey of epidemiological studies involving 19 cohorts.
[41] See Acheson, supra note 37 (cohort of 4,820; SMR 1.32); Armstrong, supra note 39 (6,505; 0.36); Clemmesen, supra note 38 (5,686; 0.86); Hodgson, supra note 38 (15,999; 0.61); Hughes, supra note 38 (6,171; 0.09); McDonald, supra note 25 (10,939; 0.99); Selikoff, supra note 29 (12,051; 1.59); Tola, supra note 38 (7,775; 0.80).
[42] D.A. Edelman, Exposure to Asbestos and the Risk of Gastrointestinal Cancer: A Reassessment, 45 Brit.J.Indus.Med. 75, 81 (1988).
[43] See Weiss, supra note 18, at 881.
[44] In the summary SMR, risk estimates from various studies are combined and standardized in the following equation: Summary SMR = (Sum of Observed Deaths ÷ Sum of Expected Deaths).
[45] Weiss divided the studies he considered into two categories according to the worker registration method employed by the study. The "inception" cohorts registered all workers whose expose to asbestos began in stipulated periods, whereas the "cross-sectional" cohorts registered only those workers who were employed as of a particular date without regard for their previous exposure histories. See id. at 876.
[46] See id. at 881.
[47] See supra note 32.
[48] See Howard Frumkin & Jesse Berlin, Asbestos Exposure and Gastrointestinal Malignancy Review and Meta-Analysis, 14 Am.J.Indus.Med. 79, 89 (1988). Frumkin and Berlin divided the cohorts into two categories according to whether the lung cancer SMR yielded by the particular study was greater or less than 2.0 in an attempt to use the rate of lung cancer as a surrogate for exposure to asbestos. Thus the 1.11 is the total summary SMR for both of these categories. The difficulties of categorizing cohorts in this manner are discussed below.

Note that Frumkin and Berlin use the following summary SMR equation: Summary SMR = (Sum of Observed Deaths ÷ Sum of Expected Deaths) × 100. However, to facilitate consistency in the following discussion of their survey and other surveys which employ this formula, the quotient of (Sum of Observed Deaths ÷ Sum of Expected Deaths) is not multiplied by 100.
The jury also heard testimony regarding the difficulties inherent to the survey approach to epidemiological literature and the difficulties unique to Frumkin and Berlin's meta-analysis. See Trail Tr. 1748-55, 1842-43. Each study evaluates the methodological and conceptual difficulties posed by the inevitable "mixing [of] apples and oranges." Trial Tr. 1843; see also Frumkin, supra, at 80-85; Morgan, supra note 32, at 60-61; Weiss, supra note 18, at 879-80. For a general discussion of the meta-analytical approach, see generally Frederic M. Wolf, Meta-Analysis: Quantitative Methods for Research Synthesis (1986).
[49] See David H. Garabrant et al., Asbestos and Colon Cancer: Lack of Association in Large Case-Control Study, 135 Am.J.Epidemiology 843 (1992).
[50] See id. at 846.
[51] At his 1976 deposition Smith alluded to the difficulty of assessing the doses of asbestos workers are exposed to on the job. In response to the question: "do you believe that the insulation workers that you observed were exposed to substantially the same asbestos hazard as the persons involved in mining, milling and manufacturing process at Asbestos, Quebec?," Smith answered:

They were exposed to the same potential hazards, definitely. I can't say exactly the same exposure, because very often the manufacturer because of the size of his company can take better precautions for controlling of the dust than the small operator can in the field.
Trial Tr. at 878.
[52] See supra note 48.
[53] See supra note 48.
[54] Robert W. Morgan, Letter to the Editor, Re: Meta-Analysis of Asbestos and Gastrointestinal Cancer, 19 Am.J.Indus.Med. 407, 407 (1991); accord Richard Doll & Julian Peto, Asbestos: Effects on Health of Exposure to Asbestos (1985). For further criticisms, see Weiss, supra note 18, at 881 (concluding that the hypothesis is that the association between lung cancer risk and the risk of cancers other than mesothelioma is caused by misdiagnosis of lung cancer and mesothelioma is more plausible than the assertion the asbestos is a systemic carcinogen).
[55] Morgan, supra note 54, at 407 (cohorts with lung cancer SMRs of less than 2.00 have a summary colorectal cancer SMR of 0.86).
[56] Frumkin, supra note 48, at 89.
[57] Edelman, supra note 42, at 81.
[58] Id. at 78 (Edelman goes on to consider examples of such artifacts); accord Weiss, supra note 18, at 876-77.
[59] See Edelman, supra note 42, at 81.
[60] See J.M.G. Davis et al., Penetration of Cells by Asbestos Fibers, 9 Envtl.Health Persp. 255 (1974); Kelly J. Donham et al., The Effects of Long-Term Ingestion of Asbestos on the Colon of F344 Rats, 45 Cancer 1073 (1980); Anderson C. Hilding et al., Biological Effects of Ingested Amosite Asbestos, Taconite Tailings, Diatomaceous Earth and Lake Superior Water in Rats, 36 Archives Envtl.Health 298 (1981); Ernest E. McConnell et al., Chronic Effects of Dietary Exposure to Amosite Asbestos and Tremolite in F344 Rats, 53 Envtl.Health Persp. 27 (1983); R. Truhaut & I. Chouroulinkov, Effect of Long-Term Ingestion of Asbestos Fibres in Rats, 90 Int'l Ass'n Research Cancer Sci.Pubs. 123 (1989).
[61] Lyman W. Condie, Review of Published Studies of Orally Administered Asbestos, 53 Envtl. Health Persp. 3 (1983).
[62] Id. at 8-9; see also Weiss, supra note 18, at 883 ("there is no support for the hypothesis of causality from animal experiments in which asbestos has been administered orally"); Edelman, supra note 42, at 81 (same).
[63] See Truhaut, supra note 60, at 123.

In his cross-examination testimony, Shy did not dispute the shared conclusion arrived at by Donham, McConnell, Hilding, Truhaut, and Condie that no carcinogenic effects are observable in animals which have ingested high doses of asbestos fibers.
[64] Although experimental data on humans is necessarily limited, the experimental evidence that has been gathered parallels the findings of the studies involving experiments with animals. Various epidemiological studies of populations drinking amphibole-contaminated water revealed no convincing increase in gastrointestinal cancer. See Hilding, supra note 60, at 300 (referring to three studies made of residents of Duluth, Minnesota who were exposed to asbestos through the city's water supply); see also Weiss, supra note 18, at 882-83 (discussing McDonald's conclusion that neither air nor water pollution with asbestos has been directly linked as a cause of either respiratory or gastrointestinal cancer).
[65] This was definitively established by Smith's 1976 deposition testimony.
[66] Weiss, supra note 18, at 882.
[67] The New Jersey Supreme Court has discussed this necessity at length:

[E]pidemiology deals with the movement of different diseases within human populations. It does not address questions of specific causation in the individual case. While epidemiological information, taken together with other medical facts, may be useful to a physician in forming a particular diagnosis or in determining the etiology of an illness, court determinations as to such matters cannot be based on an expert opinion which rests on the application of statistical skills and studies alone.
Landrigan, 127 N.J. at 412, 605 A.2d 1079.
[68] See American Cancer Society, Cancer Facts & Figures1992 8 (1992); Harrison's Principles of Internal Medicine 1289 (Jean D. Wilson et al. eds., 12th ed. 1991).
[69] Weiss, supra note 18, at 882-83.
[70] Edelman, supra note 42, at 81.
[71] N.J. Dep't of Envtl. Protection, Office of Cancer and Toxic Substance Res., Trends in Cancer Mortality in he New Jersey/New York/Philadelphia Region, 1950-1975: Data Summary (1981).
[72] See American Cancer Society, supra note 68, at 8.
[73] See id. Nor did Markowitz dispute the statement that the incidence of colorectal cancer "begins to rise at age 40 and reaches a peak from 60 to 75 yr." The Merck Manual of Diagnosis and Therapy 852 (Robert Berkow et al. eds., 16th ed. 1992). See Trail Tr. at 278.
[74] See Seidman, supra note 30; Selikoff, supra note 32; Selikoff, supra note 29.
[75] See Selikoff, supra note 29, at 96.
[76] Brennan, supra note 9, at 475.
[77] Morgan, supra note 32, at 65.
[78] Weiss, supra note 18, at 883.
[79] See id.
[80] Mario & DiBono has alleged this in a different form, claiming that USMP "failed to make out a prima facia case" of negligence on the part of the subcontractor.